## CALEB BOGGESS' HEIRS *vs.* THOMAS ROBINSON'S HEIRS.

### July Term, 1872.

1. A decree in the court below, against a person who was not a party to the bill, might be corrected in the court below, on motion, and can be corrected in this court.

2. Where a decree rendered against heirs, requiring them to make a deed for land, in full performance of a contract of their ancestor, does not specially state whether the deed is to be made with general or special warranty, it is not error for which the decree will be reversed; inasmuch as the heirs could only be required to make a deed with special warranty, and the decree cannot be construed to require them to make a deed with general warranty.

3. Whether a decree for costs in the court below be correct or not cannot be looked into in this court, when the appeal cannot be supported on any other ground.

4. A case in which a contract with the ancestor is required to be completed by the heirs, by making a deed, the contract coming within the statute of frauds by reason of part performance, possession, &c.

Suit in chancery by Thomas Robinson, ancestor of appellees, against Caleb Boggess, ancestor of appellants, commenced on the 8th day of April, 1851, in the circuit court of Harrison county.

At May rules, 1851, plaintiff filed his bill against defendant.

The bill alleged that about the year 1837, plaintiff was the owner of certain interests in the estate of one Benjamin Robinson, deceased, and the defendant was the owner of certain other interests in the same; that defendant and wife brought a suit and obtained a decree for the sale of the lands of said deceased; that pending this suit arrangement had been made between plaintiff and defendant, by which they agreed to

become equal and joint owners of interests of the heirs of said decedent, and that they did accordingly become such equal and joint owners of six of the heirs' shares of said estate; that they afterwards agreed that the defendant, Boggess, should, at the sale of the land, purchase for their joint benefit a certain tract, known as the "sixty-six acre tract," adjoining lands owned by both parties, to be divided betwen them by a certain line to be drawn from a known white oak, corner of defendant, to the nearest point on the outline of the sixty-six acre tract; that Boggess did accordingly purchase said tract at the sale, and that he and plaintiff afterwards procured one Denham, a surveyor, to lay off the line according to the agreement, and to make a plat of the same and ascertain the true quantity thereof; that the surveyor ascertained that the tract contained seventy-two acres instead of sixty-six; that the portion allotted to the said Boggess, being the northern portion, contained nineteen acres, and that allotted to the plaintiff, being the southern portion, contained fifty-three acres; that the parties afterward agreed that the plaintiff should take the fifty-three acres for his interest in the estate of the said Benjamin Robinson, and the said Boggess agreed to convey the same to him by deed; that the plaintiff accordingly assumed possession of the fifty-three acres, cleared a portion thereof, cut and sold timber off the same, and with the full knowledge and consent of Boggess, had been in quiet and peaceable possession of the same from the year 1838 to the present time, and still is in possession thereof; that during said period the said Boggess had repeatedly acknowledged his right to the land, and that he was to, and would at any time, make a deed for the same to him, or to any person he might direct, but that from some cause unknown to the plaintiff the said Boggess had refused to make the deed, alleging that the contract was merely verbal, and was therefore not binding upon him. The bill then alleged that there had been such a part performance of said contract as would take the case out of the operation of the statute of frauds, and accordingly prayed that Boggess might answer the bill and the various allegations thereof; that specific execution of the said contract might be enforced and Boggess decreed to convey the fifty-three acres to the plaintiff, and for general relief.

At June rules, 1851, the bill was taken for confessed.

On the 1st of July, 1851, in term, on his motion leave was given the defendant to file his answer within thirty days.

Of this leave the defendant does not appear to have availed himself, for he never answered the bill. and the cause stood upon the bill taken for confessed until the 24th of June, 1853, when the defendant having died, the cause was revived against his widow and heirs at law, whose names are specified in the order.

On the 21st of April, 1854, by consent, the cause was also revived against the administrators of said Caleb Boggess by name.

The cause thus stood till the 21st of April, 1862, when the plaintiff having died, the same was revived in the names of his heirs at law, given in the order.

On the 26th of March, 1864, the defendant, John R. Boggess, one of the heirs of Caleb Boggess, filed his answer to the bill. He denies the allegations on which the equity of the bill was rested in general and in detail. He denies that there was any agreement between his intestate and the intestate of defendants for the purchase of shares in the estate of Benjamin Robinson on joint account, or any agreement for the purchase of his intestate of the sixty-six acre tract on joint account of himself and the intestate of defendants, so that it was intended that the land should be divided in the manner alleged in the bill. He denies that any such interests in the estate were purchased on such joint account as alleged, or that said parties were entitled to equal interest in the same. He alleges that his intestate was tenant by the courtesy of one share of said estate, and was the owner by purchase of most of the other shares. He denies that the plaintiff Robinson had any interest in the estate except as tenant of the courtesy of one-twentieth part, his wife and her brother being the heirs of one of the daughters of the said Benjamin Robinson. He denies that the surveyor Denham was employed by the said Caleb and Thomas, the original parties, to lay off said lands, but states that he was employed by said Caleb Boggess to lay off, plat and calculate the same, (for what purpose he does not state,) but that he made no allotment of the same as alleged in the bill; and he denies that it was agreed that the said

Thomas Robinson was to take the fifty-three acres, or that the said Caleb Boggess was to convey the same to him by deed. He denies that Thomas Robinson took possession of the said land under such agreement, or took timber from the same or that he had been in quiet posession of the same since 1838, though he admits that he was in possession at the time of the sale of a portion of the same, part of which was called the "tobacco field," and that he continued in possession thereof; but he says this was claimed as part of a tract of land descended to Robinson's wife and her brother, Samuel Boggess, from their father, John Boggess, who had resided upon and improved and cultivated the same in his lifetime. He denies that Caleb Boggess ever had acknowledged that Thomas Robinson had paid the purchase money for the fifty-three acres, or that he was the true owner of the land. He says that Caleb Boggess did believe that a portion of the sixty-six acres would be more valuable as an addition to the land on which Thomas resided than to his own place, and that he was willing to have conveyed the same to him if he paid him therefor, but that there was no agreement beyond the expression of such willingness, and that Thomas Robinson never did pay for the same. He admits that Thomas did take timber from the said land, and coal from other lands of the said Caleb Boggess, with his knowledge and consent, but that this was permitted by the latter because of the indigent circumstances of the said Thomas, and because his wife was a niece of the said Caleb and raised in his family. He denies that there had been any such part performance of such an agreement, as alleged, to take the case out of the statute. He says that he knows nothing of the receipt by the said Caleb Boggess of the proceeds of the said lands further than the amount of his own interest, and those of other heirs that he had purchased. He says that he gave his bonds for the purchase money of the land he bought at the sale by the commissioner of the court, and that he, as administrator, found these bonds among his papers after his death and supposed they had been paid by him. He says that he does not know that the said Caleb Boggess ever acknowledged Thomas Robinson to be the true owner of the fifty-three acres, nor does he believe that he ever promised to make a deed for the same to

him or any person he might direct, unless accompanied by the qualification that Robinson was to pay for the same and what he owed him beside, or give a lien to secure the payment thereof. He says that Caleb Boggess always told him that no money had been paid him by the said Thomas Robinson for the said land, and that the latter had been always largely in his debt.

On the 7th of December, 1864, the defendants, B. R. Boggess M. C. Boggess and M. R. Boggess, filed their anwwer to the bill. This answer is to the same purport and effect as the answer of John R. Boggess, and is quite as broad as the former answer.

Numerous depositions were taken by both parties and filed in the cause. Ezekiel Gray proves that he knew the land in controversy; that Boggess told him that he and Thomas Robinson had bought the land in partnership, that Robinson had paid him for his part, and if he would pay him what he owed on other accounts, he would make him a deed for the the land; that he spoke of Robinson having borrowed ten bushels of wheat of him, and of his having gone Robinson's security for a small debt, which he had had to pay; that he (witness) was at work for Boggess, and proposed to make some rails on this land, but that Boggess said the land belonged to Robinson. This conversation occurred in 1849 or 1852.

James Denham, a surveyor, states that he was called on by Boggess or Robinson, or both, to make a plat and division of the land, laying down the dividing line from the white oak corner to the nearest point on the outline of the tract. He makes the original plat a part of his deposition, and thinks he gave one of the parties, (perhaps Boggess,) a copy of it. He thinks the quantity allotted to Boggess was about twenty acres, and that to Robinson about fifty-two acres.

John Furner states that about eleven years previously he was on the hunt of a piece of land to make purchase, and met Caleb Boggess, of whom he inquired if Robinson had not a piece of land to sell; that Boggess said that he had; that he then asked him if Robinson could make a good title; that Boggess replied that the right would have to come through him (Boggess), and that he would make a good title to any one who should buy of Robinson. He understood from what

Boggess said that the land belonged to Robinson, and he would have made the purchase if they could have agreed on the price.

William M. Robinson understood from Esquire Boggess on the day of the sale that if he (Boggess) purchased the land, Robinson was to have the portion of it now claimed by paying him (Boggess) for the same in proportion to what he paid for the whole. He also, at a subsequent time, understood from Boggess that Robinson had been in possession of the land, improving it and taking timber from it, since shortly after the sale.

John B. Denham had a conversation with Boggess in 1850, in which he said that Robinson, on a fair settlement, would be owing him considerable, though as to part of the debt Robinson might, if he chose, plead the statute of limitations, and spoke of his purpose to have a settlement with Robinson in a short time to guard against the casualty of the death of one or the other. Boggess, in this conversation, stated that he held a part of Robinson's land in his (Boggess') name, and if he did not pay him what he owed him for horses and other things he had let him have, he (Boggess) would keep the land, and that as he (Robinson) had taken most of the timber off, he ought not to complain.

David Holder had a conversation with Boggess about the land in controversy. Boggess spoke of it as a piece of land that he and Robinson had bought together, and said he understood Robinson was going to sue him for a deed for the same, and that if Robinson had done as he ought to have done, he would have made him the deed. He said that Robinson owed him some two or three hundred dollars and that he would make the deed after he paid him. He spoke of dealings between Robinson and himself, and of wheat and sheep he had let Robinson have.

Samuel Boggess swears that he had an interest in the land, and that he let Robinson have it and gave him his title bond for it; that after he had sold it, Boggess offered him fourteen dollars for it, which he declined.

Felix R. Coffman had a conversation with Mr. Boggess in relation to this land, some five or six years after he purchased it at the sale; he asked him if he would sell any of it. Mr.

Boggess replied in the negative, stating that Robinson was to have part of it, George Boggess a part, and the remainder he intended to keep for himself. He says that Robinson had had possession of part of the land, and made some improvements upon it a little west or northwest of the "tobacco house lot." Before Robinson got possession of it, Caleb Boggess held the possession as guardian for the infant children of John Boggess, deceased, and it was during this time the tobacco lot was enclosed and improved.

Edward Parrish, in 1848, expected to get a contract for building a bridge near the land, and went with Mr. Boggess to see if the stone on this land would answer for this work; he found the rock would answer, and asked Mr. Boggess to whom they belonged; he said they belonged to Thomas Robinson, and that he supposed he would sell them; they then went to the field where Robinson was, and in presence of Mr. Boggess, he asked Robinson his price per perch for the rock, and Robinson told him, if they would answer, and he was contractor, to come on and get them.

Samuel Boggess proves that the land on which the building stone was, was the land now in controversy. He was afterwards examined as a witness for the defendant, and proves that Caleb Boggess had possession of all the cleared land upon the tract before Robinson moved upon it, and that the latter took possession of the whole at the same time and had made some improvement upon it to the extent of one and a half or two acres, that he also used the stone and timber upon the land at his discretion.

J. Y. Hornor, a witness for defendant, states that he was a creditor of Robinson, and he gave up two tracts of land, one of fifty acres and the other of thirty-three acres, to be sold by the sheriff for the payment of his debts, saying he had nothing but his land to pay what he owed; that these lands were sold, and bought by witness at four hundred dollars, which was within from forty to sixty dollars of paying the executions, including his own. Robinson did not claim or speak of any other land at the time. He says he knew of the purchase by Boggess, of the land in controversy, and that Boggess some time previously had offered to sell him a portion of it, that he spoke with Robinson on the subject, and found

that he claimed it by a contract with Boggess; that he then had a conversation with Boggess, who admitted there had been a contract that Robinson was to have a portion of the land by paying the purchase money, which he had not done.

John Furner being asked how he learned what he stated when he gave his deposition for the plaintiff—stated from whom he learned that Robinson had had land to sell, and that it was from Mr. Boggess he learned that the title was in him.

David W. Robinson thinks Gray's character for truth and veracity is bad, and would not believe him on oath. He never heard the defendant impeach his testimony, but had heard it impeached by persons against whom he had taken peace warrants.

J. H. Robey thinks Gray's character bad, and would not believe him on oath.

Isaiah Harbert never heard Gray's evidence questioned one way or another, but says his general character is bad, and he would not take him. Examined as to the circumstances of Robinson—says, he knows but little about it himself, but heard that he was broken. He had a debt of about fifty dollars against him of which he received payment, in conjunction with one Albertus Boggess, who also had a debt against Robinson, in certain stills purchased by Boggess on their joint account. He got half the stills, but would rather have got his money.

Albertus Boggess had a debt of forty dollars against Robinson, contracted in 1835 or 1836; he paid twenty dollars on it, and the balance was paid on the stills he purchased from him on joint account of himself and Harbert. The price of the stills was one hundred dollars, which he considered a fair price; between 1837 and 1844, times were hard, money was scarce and people were complaining—at some time during that period, property could not be sold at a fair price.

T. C. Martin, a constable, held a claim against Robinson, which he made by the sale of certain property given up for that purpose. He had a claim for some costs against him, for which he gave him a note on one Starks to collect, which, however, he failed to collect; some other property on the place besides that given up to be sold, but thinking he had enough to pay the debt, he did not take much notice of it.

Between 1839 and 1852, there was pressure in the money market—the people became distressed, and much property sold—heard the report that Robinson was broken, from Caleb Boggess, and from others, about the time he sold the stills.

Truman Elliott was not acquainted with Gray's general character for truth and veracity, but his general character was bad, as upon general report he could not believe him on oath; knew Robinson; heard that his property was held in the name of his wife, but had no recollection of hearing that he was insolvent; he had gone his security to L. Lowndes, for a debt of one hundred and twenty-four dollars and seventy-four cents, and Robinson had secured him by assigning a lease that he held; the debt to Lowndes was paid, and he was never called on for it. Some eight or ten years before, he had sold Robinson property on credit to the amount of one hundred and ten or one hundred and fifteen dollars, and took his note, which was paid shortly after it was due; there had been other dealings between them to a small amount, perhaps not exceeding fifty or sixty dollars at a time; when he sold Robinson the property referred to, he thought him good for the amount.

On the 27th of September, 1865, the cause was heard on the bill, the answer filed, replications thereto, the exhibits and depositions when the court pronounced its decree declaring the plaintiffs entitled to a specific execution of the contract in the bill mentioned and requiring the defendants to convey the said fifty-three acres of land to the plaintiff by sufficient deed, and also to pay them their costs. From this decree the defendants, on the 17th day of September, 1870, appealed to this court.

*A. F. Haymond* and *C. Boggess* for the appellants.

*Lee,* in support of the decree, relied upon the following points:

1. The bill charges a plain and distinct contract between the said Robinson and Boggess, by which the latter was to purchase in at the sale then shortly to be made, the sixty-six acres of land on joint account, to be divided between them on an agreed and understood line—that the said Boggess did

make the purchase accordingly, and that it was afterwards agreed that Robinson should take for his entire interest in the property of Benjamin Robinson, the fifty-three acres allotted to him, and that the said Boggess should make him a deed for the same accordingly.

2. That these allegations of the bill were duly taken for confessed by the said Boggess at the June rules in 1851, and although he subsequently obtained leave to file his answer within a limited time, he never availed himself of the leave, but died without answering the bill, and the cause was revived against his heirs in June, 1853, nearly two years after.

3. That the denials in the answer of the defendants filed, though broad and sweeping in their character, yet lose much of their force from the fact that they embrace in their scope matters as to which the respondents could have no personal knowledge whatever.

4. The contract and agreement alleged in the bill is sufficiently proven by the evidence. Boggess, the defendant, never filed an answer denying it during his life, and the existence of such a contract is proven by his own witness, Hornor, though with the qualification as stated by Boggess that Robinson had not paid what he was to pay ; and it is abundantly corroborated by the employment of Denham, the surveyor, to make the division and allotment of the land between the parties, the continued possession of the same by Robinson, and its enjoyment by him with the knowledge of Boggess after the purchase, and without interruption by him, and the repeated recognitions by Boggess that it was Robinson's land, to different persons, and that he was to make a deed for the same to any one he might direct. See the testimony of Gray, Furner, J. B. Denham, Holder, Coffman and Parish. The conduct of the parties is only to be reconciled on the theory of a contract by which Boggess was to convey the fifty-three acres to Robinson or his appointee.

5. The agreement between Boggess and Robinson, that the former should buy in the sixty-six acres at the sale on their joint account, constituted a trust which would not be within the statute of frauds, but which it would be the duty of the court of equity to enforce without reference to the character of the evidence by which it was shown.

6. But if this were otherwise, and if the contract were one coming within the statute of frauds, yet upon the proofs, such part performance of the same has been shown, as according to the well settled rules and maxims of the court of chancery, will entitle the plaintiffs to a decree for specific performances throughout. It is true that Boggess had taken possession of the sixty-six acre tract as guardian for the infant children, (of whom Robinson's wife was one,) of John Boggess, who it seemed had some claim to this land; and Robinson after his marriage with the daughter of John Boggess, took possession of part of what was called "the tobacco house field;" but the land was sold as the property of Benjamin Robinson, and after the contract between Robinson and Boggess, Robinson's possession was extended to and defined by the partition made by Denham, the surveyor, embracing the whole of the fifty-three acres thrown off on Robinson's side, by the line running from the white oak corner to the nearest point on the outer line of the tract; and this possession was held for years by Robinson, under the contract with Boggess, and with his knowledge and perfect acquiescence. It was therefore a clear case of part performance, sufficient under the well settled doctrine of the court of equity, to take the case out of the operation of the statute of frauds and perjuries.

7. The pretension now set up that Robinson was to pay for the fifty three acres in money is not sustained by the evidence. In truth, there is no evidence to that effect in the case, except the mere declarations of Caleb Boggess; and the whole conduct of both parties show that Robinson's version of the matter is correct, that Boggess was to convey the fifty-three acres to him in consideration of his entire interest in the estate of Benjamin Robinson, deceased. That he had an interest in that estate, (that of his wife and Samuel Boggess,) is clear, and the acts and declarations of Boggess, as proven in the cause, show that he regarded Robinson as entitled to a conveyance of fifty-three acres in full satisfaction of his interest, whatever it was. But it seems Boggess claimed that Robinson was indebted to him on account of other dealings between them, and he determined to withhold the conveyance of the fifty-three acres until Robinson should pay him what he then claimed on other accounts. This he

clearly had no right to do. Whether Robinson did owe him or not on those other accounts is not proven in the cause; at least all we have on that subject is the mere unsworn declarations of Boggess; but if he were so indebted, that gave Boggess no right to withhold the conveyance on that account. Such indebtedness on other accounts constituted no lien upon this land, and there is no pretence of any agreement on the part of Robinson that it was to be secured as by a lien upon the land. Nor is there any principle in equity upon which Boggess could successfully assert a claim to have such merely private and personal debt secured as by a lien upon the land, with which it was in no manner connected, or upon faith of which it was not contracted. The refusal of Boggess to make the conveyance upon this account was a mere assumption of a power on the part of Boggess, a mere creditor at large, which can find no warrant in the rules and principles of the court of equity.

MAXWELL, J. The contract set up in the bill is sufficiently definite, and appears to be substantially proved as alleged.

In respect to the point made that there is a decree against Fernando A. Robinson when he is no party to the bill, this is an error that might have been corrected in the court below on motion, and may now be corrected here.

The point that there is error because the decree does not direct specially whether a general or special warranty deed should be made, is not well taken. The defendants can only be required to make a deed with special warranty, and the language of the decree cannot be construed to require them to make a deed with general warranty.

Whether the decree for costs is as it should be or not is a question that cannot be looked into by this court, as the appeal cannot be supported on any other ground.

The decree complained of will have to be corrected as indicated and affirmed with damages and costs.

The other judges concurred.

DECREE AFFIRMED.