# CHARLESTON.

## WARD AND OTHERS v. BROWN, *et als.*

Submitted January 26, 1903,   Decided April 18, 1903.

1. EXECUTOR—*Will—Appeal.*
   An executor of a will may propound it for admission to probate, and prosecute an appeal from a decree, declaring it void, in a suit brought to impeach it.   (p. 236).

2. WILL—*Bill.*
   Whether a bequest actually made is valid cannot be inquired

into upon a bill filed to test the validity of a will. That question is properly raised upon a bill to construe and expound the will. (p. 232).

3. ERROR—*Will.*

It is not error to direct an issue *devisavit vel non* without proof of the interest of the plaintiffs, unless objection has been made that they would have no interest in the estate if the will were set aside, or unless such want of interest appears from the record itself. (p. 232).

4. WILL—*Attesting Witness—Execution.*

Attesting witnesses of a will who are introduced to impeach the will on the grounds of want of proper execution, unsoundness of mind or undue influence, will not be excluded; but their evidence will be viewed with much suspicion; and it is proper to so instruct the jury. (p. 238).

5. WILL—*Attesting Witness—Error—Instruction.*

When part of the attesting witnesses testify against the will, it is error to instruct the jury that the evidence of the witnesses present at the execution of the will is entitled to peculiar weight. (p. 253).

6. INSTRUCTION—*Error.*

When a proper instruction is asked, and given, it is error to give another improper instruction which modifies it and nullifies its effect or obscures its meaning. (p. 255).

7. SANITY—*Expert Testimony.*

Evidence of physicians as to testamentary capacity is entitled to greater weight than that of non-professional persons, provided they have had personal observation and knowledge of the person whose mental capacity is in question. Otherwise it is not. Rule on this subject announced in *Jarrett* v. *Jarrett,* 11 W. Va. 584, *Kerr* v. *Lunsford,* 31 W. Va. 659, and *Nicholas* v. *Kershner,* 20 W. Va. 255, examined and explained. (p. 256).

8. EXPERT TESTIMONY—*Error.*

Expert testimony, except under special circumstances, is entitled to only such weight as the jury may deem it entitled to when viewed in connection with all the evidence and circumstances; and it is error to instruct the jury that the evidence of physicians testifying as experts only on the trial of an issue *devisavit vel non* is entitled to great weight. (p. 257).

9. CLASSIFICATION OF WITNESSES—*Error—Instruction.*

It is error to classify witnesses in respect to the weight and value of their evidence by an instruction to the jury unless the classification is based upon a well defined distinction as to

the opportunities and powers of the witnesses to know the truth.   (p. 257).

10.  TESTATOR—*Sanity.*

Evidence of the acts and conduct of the testator tending to show soundness of mind at or near the time of the execution of the will is entitled to more weight than the opinions of witnesses based upon the erratic conduct and eccentricities of the party of whom they speak.   (p. 263).

11.  TESTATOR—*Sanity.*

When there is a doubt as to the competency of the testator to make a will, the fact that he has given his property to persons other than those related to him in a reasonable degree by blood, is proper to be considered by the  jury.   (p. 266).

12.  IMPEACHMENT—*Evidence.*

When evidence is introduced to show interest on the part of a witness for the purpose of discrediting him, it is improper to refuse to admit evidence to show the extent of such interest or to disprove its existence; and any person who is conversant with the facts may testify as to them, although the alleged contract is between the witness and a municipal corporation.   (p. 267).

13.  INSTRUCTION—*Witness.*

An instruction which tells the jury that, if they believe any witness has testified falsely in the case as to the material matters, they may disregard such false testimony or give to it and all the evidence of such witness such weight as they believe it entitled to, is improper in failing to inform the jury that they may disregard all the evidence of such witness. *(*p. 268).

14.  INSTRUCTION—*Witness.*

If an instruction is proper in other respects it is not vitiated by merely naming the witness to whose testimony it is applicable  (p. 269).  ·

15.  COURT—*Instruction.*

The court is not bound to repeat its instructions.   (p. 270).

16.  SYLLABUS  APPROVED.

Point 20 of the syllabus in *McMechen* v. *McMechen,* 17 W Va. 683, approved.

17.  WILL—*Testator—Insanity.*

Where a will has been prepared by, and executed in the presence and under the direction of a lawyer of ability and good standing professionally and as a citizen, and two of the attesting witnesses attempt to impeach the will on the grounds of non-execution, insanity and undue influence, and the person under

whose supervision it was executed is dead and an effort was made, when too late, to take his testimony, it is proper to admit evidence of his character and capacity. (p. 271).

18. INSTRUCTION—*Error.*

When an erroneous instruction has been given by the court to the jury, the presumption is that the exceptor was prejudiced thereby, and the verdict will be set aside on account thereof, unless it clearly appears from the record that he could not have been prejudiced thereby. (p. 273).

19. INSTRUCTION—*New Trial.*

When a correct instruction is refused, the verdict will be set aside, unless the appellate court can see from the record that, even under the instruction, a different verdict could not rightly have been found. (p. 274).

20. INSTRUCTION—*Reversal.*

The giving of erroneous instructions bearing upon the weight and value of certain testimony, when the evidence is contradictory, is cause for reversal. (p. 274).

Appeal from Circuit Court, Kanawha County.

Bill by John Ward and others, B. Ward's heirs, against J. F. Brown and others. Decree for plaintiffs. Defendants appeal.

*Reversed.*

BROWN, JACKSON & KNIGHT, FLOURNOY, PRICE & SMITH, and MOLLOHAN, McCLINTIC & MATTHEWS, for appellants.

E. W. WILSON and A. B. LITTLEPAGE, for appellees.

POFFENBARGER, JUDGE:

Brigham Ward, a resident of the city of Charleston, and an eccentric old man, died on the 7th day of April, 1896, leaving a will which he had executed two days before his death. Many of his peculiarities and eccentricities are attributed to the fact that from his birth he had been afflicted with what is called a cleft palate, which interfered with his speech. He was originally from New Hampshire, and came to this state in 1859. After serving in the federal army for some time, he came to Charleston near the close of the civil war, and continued to reside there. He never married nor had he any relatives living near him. For many years he had been in the grocery busi-

ness and, at the time of his death, he owned considerable property. By his will, after directing payment of his debts and the erection of a monument to cost not more than six hundred dollars, he bequeathed ten thousand dollars of his estate to the trustees of the Kanawha Presbyterian Church, to be used by them in paying off the debt contracted by them in enlarging the church edifice, and the residue of his estate he gave to the city of Charleston, to be invested and to be known as the Brigham Ward Hospital Fund, the income to be used in supporting and maintaining free beds in the hospital of said city then in process of erection. The will was prepared by Edward B. Knight, a very able lawyer and an upright man, and he and James F. Brown were appointed executors of the will. Mr. Brown qualified but Mr. Knight did not.

After the will had been probated in the county court of Kanawha county, John Ward and others, nephews and nieces and grand nephews and nieces of the testator, instituted a suit in chancery, alleging in their bill that they were the only heirs and distributees of said Brigham Ward, that the writing which had been probated was not his will, that, at the time it was executed he was of unsound mind, and that undue influence was exerted over him to induce him to make the will, and praying for an issue *devisavit vel non.* Answers were filed by the executor, the trustees of the church and the city of Charleston, the issue directed, and tried on the law side of the court and a verdict was rendered in favor of the contestants. Numerous exceptions were taken to the rulings of the law court and, among others, to its action in overruling a motion to set aside the verdict. After the proceedings in the law court were certified and returned to the chancery court, another motion was made to set aside the verdict and it was overruled and a decree entered, declaring that said paper writing was not the will of said Brigham Ward. From this decree an appeal was taken by the executor of the will and the trustees of the Kanawha Presbyterian Church. The city of Charleston did not join in the petition for the appeal but, before the case was argued and submitted, it appeared by counsel and united in the appeal, praying that the decree might be reversed, the verdict of the jury set aside and a new trial awarded and that the brief filed for the appellants be read in its behalf.

It is insisted by counsel for the appellees that the bequest to the Kanawha Presbyterian Church is void, that the executor has no interest in the matter in controversy, that the city of Charleston is not properly before this Court, and that, therefore, the appeal should be dismissed. The first reply to this is that the bill does not allege invalidity of the bequest to the church trustees. Upon that question the court below took no action whatever, nor could it have done so in the absence of pleading. If the bill contained such an allegation, it would have been improper since that question is one of construction to be disposed of in a subsequent suit brought for the purpose of having the will construed in case it should stand. This proceeding is little, if anything, more than one of probate, since it can only be entertained by a court of equity under a special statute and does not belong to the general chancery jurisdiction of the court. Many authorities hold that the only question that can be decided is whether the alleged will or any part thereof is the will of the testator. In other words, whether in fact and in law the paper was executed as and for the will of the testator. After that function is performed the court can go no further. *Colter's Executor* v. *Brown,* 1 Grat. 18; *Dower* v. *Church,* 21 W. Va. 23; *Lamberts* v. *Cooper's Executors,* 29 Grat. 66; *Connolly* v. *Connolly,* 32 Grat. 657; *Kerr* v. *Lunsford,* 31 W. Va. 659; *Coffman* v. *Hedrick,* 32 W. Va. 119. In *Couch* v. *Eastham,* 27 W. Va. 796, JOHNSON, JUDGE, said: "Upon a bill filed to test the validity of a will, which has been regularly admitted to probate, the function of the suit is exhausted when that question is decided. It would be strange in a suit brought to set aside a will, that the will should be expounded." In *Malone's Adm'r* v. *Hobbs,* 1 Rob. 388, Banldwin, Judge, said of the Virginia statute, which is similar to ours, "that statute provides a supplemental tribunal to revise the decision of the court of probate, if in favor of the will; and that tribunal is a jury, to be empanneled for trial of the issue of *devisavit vel non,* to be directed by a court of chancery. The jurisdiction, such as it is, so conferred on the chancery courts, is not part of the original jurisdiction of the courts of equity, which will not (in the language of the books) in an adversary way, take jurisdiction to determine the validity of a will. It is a probate jurisdiction to be exercised not by the

chancellor, but by the jury; and its only power, is to convene
the proper parties, and to cause the prescribed issue to be
made up and tried, with the incidental power to grant a new
trial, and to remove impediments and furnish facilities to a
full and fair trial of the merits before the jury." An exam-
ination of the authorities cited clearly shows that this doctrine
announced by the Virginia court of appeals many years ago
has been adhered to until this time.

It is claimed that *Jele* v. *Lemberger,* 163 Ill. 338, asserts
a different doctrine. Lemberger brought a suit to set aside
the will of his deceased uncle, devising to certain other per-
sons real estate in which he would have taken an interest as an
heir, but for the will and his alienage, disclosing on the face
of his bill the fact that he was an alien, by saying in the first
sentence of the bill: "Your orator, Joseph Lemberger, of the
Empire of Germany," &c. On an issue the jury found for the
will, and he appealed from the decree adjudicating its validity,
the supreme court reversed the decree on the ground that it ap-
peared that the plaintiff, being an alien, not qualified to hold
real estate in Illinois, was not a person interested within the
meaning of the statute, conferring equity jurisdiction to enter-
tain bills to impeach wills. Whether the Illionis court correct-
ly construes the words "and person interested" found in the
statute, when it holds that the interest must be pecuniary,
(*McDonald* v. *White,* 130 Ill. 493), need not be determined
here. But it can be reasonably asserted, and with perfect con-
sistency with the Virginia and West Virginia decisions, that
a claimant under a clause of a will, questionable as to its
validity, has an interest thereunder which entitles him to a ju-
dicial construction of that clause, before what he receives
under it can be taken from him, and that a bill to impeach
and construe a will in one and the same suit cannot be
maintained. Here the will gives $10,000.00 to trustees for
the payment of debts incurred in enlarging the church, secured
upon church property, and debts hereafter to be created in a
similar manner, provides for the payment of the testator's
debts and funeral expenses and the erection of a monument,
and then gives the residue of the estate to the city of Charles-
ton. Suppose the bequeath to the trustees is void, and the will
is valid. Who could then contest the validity of the clause

except the city of Charleston? What would be the result if it declined to do so? Can the city of Charleston remain silent, and fail or refuse to contest it, and thus allow the payment of the debts, as provided by the will? Can it be said then that the church trustees have no interest in the clause? Will the court, in a proceeding of this kind, anticipate and forestall these possibilities, by holding that the trustees have no interest? Under these peculiar circumstances, it cannot be consistently done. Nor will it be asserted that, when a will, containing an alleged invalid clause, has been probated, and is sought to be impeached, the claimant under such clause has not such an interest as entitles him to appeal from a decree declaring the paper in question not the will of the decedent. This case and that of *Jele* v. *Lemberger* do not stand on the same ground. Here, the right to appeal by a person in whose favor the will contains a clause is involved, and the appeal has been granted, bringing into this Court for review, the proceedings in the cause in the court below. In the other case the question was whether the appellant had such interest as entitled him to institute a suit to impeach the will. The distinction is very marked and material. All the legatees were interested in the question tried in the circuit court, the validity of the will. As to it they stood on an equal footing in this, that, according to its determination, all should win or lose. When the rights of the parties are thus dependent upon a single issue, an appeal by one of them brings that question up for all. Points 7 and 8 of the syllabus in *Walker* v. *Page,* 21 Grat. 636, are as follows: "Where the parties in a cause stand upon distinct and unconnected grounds, where their rights are separate, and not equally affected by the same decree or judgment, then the appeal of one will not bring up for adjudication the rights or claims of the other. Where the parties appealing and the parties not appealing stand upon the same ground, and their rights are involved in the same question, and equally affected by the same decree or judgment, the Court of Appeals will consider the whole case, and settle the rights of the parties not appealing as well as those who bring their case up by appeal." to the same effect are the following cases: *Tate* v. *Liggat,* 2 Leigh. 84, 107; *Lewis* v. *Thornton,* 6 Munf. 87, 97; *Lenows* v. *Lenows,* 8 Grat. 349; *Purcell* v. *McCleary,*

10 Grat. 246; *Mollohon* v. *Newman,* 10 W. Va. 488. It is claimed, upon the authority of *Adamson* v. *Pierce,* 9. W. Va. 249, that the city of Charleston was not affected by the appeal taken by the other parties. The case of *Mollohan* v. *Newman,* 10 W. Va. 488, holds the contrary of this, and it is not believed, either that the two cases are in conflict, or that *Adamson* v. *Pierce* supports the contention of appellees. It holds that a party jointly interested on the same side with another party who has taken a writ of error to the judgment may, under the statute, sue out another writ himself, in order to protect himself against a dismissal by his co-plaintiff in error, thereby admitting that a reversal upon his co-plaintiff's writ would avail him, or an affirmance or dismissal preclude him. There may be a severance of joint parties, but, until there is, the judgment or decree is an entirety, binding all. *Mollohan* v. *Newman,* 10 W. Va. 488. A case covering entirely and specifically, the objection raised here, is *Bowlby* v. *DeWitt,* 47 W. Va. 323, holding that when the rights of co-parties are not only involved in the same question, but equally affected by the decree or judgment, the appeal of the one will call for an adjudication of the rights of the other not appealing. See also, *Vance Shoe Co.* v. *Haight,* 41 W. Va. 282; *Weekly* v. *Hardesty,* 48 W. Va. 30.

Upon the same principle, the appeal of the executor brings up the decree as to all who claim under the will, and that he has an interest which entitles him to maintain an appeal is beyond question. In character, this proceeding is one of probate, and the propounding of the will for probate has always been one of his duties. "Under early procedure, it was often said that the executor was the proper person to propound the will for admission to probate." Paige on Wills, sec. 317; Baskett's Estate, 78 L. T. Rep. 843; *Redmond* v. *Collins,* 4 Dev. L. (N. C.) 430; *Ford* v. *Ford,* 7 Hump. (Tenn.) 92; *Foster* v. *Tyler,* 7 Paige (N. Y.) 48, 51. "In the English ecclesiastical courts, which had jurisdiction only of wills of personalty, a will could be propounded by none but the executor named in it, either voluntarily or upon the citation of others interested in the subject. If the executor refused or renounced, it could then be propounded by any other person interested. In a few of the United States the primary right to offer

the will for probate belongs to the executor, if one is named, and a party interested may act only where none is named or the executor is dead, non-resident, or refuses to act." 16 Ency. Pl. & Pr. 997. Anciently, only wills of personal property were probated. In the Virginias, wills of both personal property and real estate have been probated by virtue of the statute for a great many years. After this change was made, the statute was construed in the great case of *Wills* v. *Spraggins,* 3 Grat. 555, where the first defect in the Virginia statute was developed, and Baldwin, J., after reviewing the entire history of probate law and considering the statute in connection therewith, said: "It follows from these considerations, and as a matter of necessity, that under our statute, a sentence against the propounder of the instrument is a sentence against all claiming under it. He is the champion of the common cause, and charged to keep the lists against all antagonists, and not the less that some of his associates may be disabled by infancy, covertures or other impediments. * * * It follows that any will may be propounded, not only by the nominated executor, but by any legatee or devisee therein, who has an interest in establishing it, without regard to the nature of the property upon which it acts; and that such propounder, in common with others of a like interest, who may choose at any time to associate themselves with him as parties, becomes the representative of the will for the purpose of its probate, and the representative of all others of a like interest, though not formal parties." Some authorities have been cited here on the subject of the character and extent of an executor's interest, from which it is argued that he has no interest which would entitle him to appeal, but no case has been presented which says he has not such interest, or that he has not the power to do so, or that for the purpose of probate he does not represent the will and all persons claiming under it. Mere strained argument and inference from his want of power to do other things is no answer to the universal declaration of the courts that he may propound the will, and that, in so doing, he acts for everybody who claims under it. To show the utter inapplicability of the cases cited, the following are here noted: *Estate of Sanborn,* 98 Cal. 103, holding that a public administrator cannot contest a will.

*Reid* v. *Vanderheden,* 7 Cow. (N. Y.) 719, holding that a person who has no interest under a will, or who had an interest which has ceased, cannot be a party to a proceeding for the probate of the will.  *Myer* v. *Frogg,* 7 Fla. 292, holding that a person named in the will as an executor has no such interest as will disqualify him as a witness to the will.  *In Re Hickman* 101 Cal. 609, holding that a public administrator is not entitled to letters of administration as against an executor of a will which merely appoints an executor without disposing of any property, and that the executor is so entitled.  *Garnett* v. *Childers,* 2 Munf. 277, *Boggess* v. *Robinson,* 5 W. Va. 402, and *Jones* v. *Cunningham,* 7 W. Va. 707, all holding that a reversal cannot be had for mere error as to costs; and *Stewart's Estate,* 107 Ia. 117, holding that an executor cannot contest the probate of a codicil, revoking his authority.  The bare statement of the purpose of these cases so clearly shows their insufficiency to sustain the contention of counsel for appellees, that further comment on them would be a waste of time and labor.  In addition to the authorities already cited, the following cases expressly decide that an executor may prosecute an appeal; *Shirley* v. *Healds,* 34 N. H. 407; *Smith* v. *Sherman,* 4 Cush. (Mass.) 4 11; *Bellon's Estate,* 60 Vt. 60; *Fairfax* v. *Fairfax,* 7 Grat. 36.  This will makes such disposition of the testator's estate as makes a sale of the real estate necessary, and expressly authorizes it, thereby vesting in the executor power over it, and charging upon him the duties respecting it, so that, although he has no personal interest in it, he has a more immediate and higher interest in it than any other person in his representative capacity, just as in the case of a will of personal property, where he takes the legal title He must act for all who take under the will.  All they can receive from the state comes to them, not immediately, but mediately, through the executor.  He must sell the real estate and apply the proceeds as directed by the will.  The will operates a conversion of the real, into personal, property. *Brown* v. *Miller's Exr's.,* 45 W. Va. 211; *Doan* v. *Mercantile Trust Co.,* 160 N. Y. 497; *Everitt* v. *Everitt,* 29 N. Y. 39; *Hatch* v. *Bassett,* 52 N. Y. 359; *Power* v. *Cassidy,* 79 N. Y. 602; *Underwood* v. *Curtis,* 127 N. Y. 523.

On the trial of the issue, the proponents of the will intro-

duced Dr. F. S. Thomas, a physician of twenty-one years' experience as a practitioner, and one of the attesting witnesses to the will, who testified that he had known the testator for twenty or twenty-five years; that he had attended him as his physician for four or five years prior to his death and during his last illness; that he was called in said illness on the 30th or 31st day of March, and went to see him every day from that time three or four times a day until he died on the 7th day of April; that he was a suffere from asthma and had taken cold which had developed into capillary bronchitis and fever which exhausted him; that some days before the will was made the testator talked to him about making the will and asked him what he thought of Mr. Knight in that connection; that he told him he could not get a better man; that the next day the same conversation took place; that on Sunday before the death of the testator witness asked him if he had made his will, to which he replied no, but that Mr. Knight was drawing it and it would be fixed up the next day; the witness told him he thought he had better make the will then if he intended to do so, and Mr. Knight was sent for and the will executed on Sunday; that when Mr. Knight came he opened the will and read it to the testator, who said it was just what he wanted, so far as it went, but it did not then contain the residuary clause in favor of the city and, after some discussion about what was to be done with the surplus, Mr. Knight suggested that it be left to the hospital, to which the testator immediately assented and asked witness what he thought of it; that he replied, "All right, sir. You are making your will; I am not;" that after it was prepared witness got testator out of his bed and into a chair at a table, and he was unable to sign his name and asked witness to sign it for him and he did so and testator made his mark; that he helped him back to his bed and the witnesses signed the attestation; that he and Mattie Jenkins, two witnesses, signed it in the presence of each other and in the presence of the testator; that the testator signed the will in the presence of all three of the witnesses; that Jacob Debolt, the other witness, went out of the room after the testator had signed and had to be called but witness thinks he was not in the room when the other witnesses affixed their signatures; that the testator, at the time, said the will was just the way he wanted it; that afterwards on

that and on the next day he said the will was all right; asked the witness what he thought of the manner in which he had disposed of his property; that he was then about eighty years old and died of acute pneumonia; that his mental condition was good; that he was "just as bright as he ever was, mentally;" that he was a very bright man; that on the next day he was as "clear as a crystal;" that he was perfectly intelligent during his sickness and up until the time of his death; and that on Tuesday evening when he died he had become exhausted.   On cross-examination a number of questions were propounded to the witness in reference to the symptoms of insanity and what constitutes insanity, and also as to his interest in the hospital, that institution having been leased to him by the city.   He admitted having taken some interest in the movement to induce the county court of Kanawha County and the City of Charleston to build the hospital, but denied that he had any connection whatever with the bequest made and also that he in any way influenced the testator in reference to the matter. ·

Dr. T. L. Barber, another witness for the defendants, testified that he had known the testator; that he joined the Kanawha Presbyterian church about two years before his death and attended regularly, when able; that in the fall of 1895, the testator told witness he did not expect to live but a short time and that he expected the church to have what property he had; that he had had a number of conversations with the testator in the last few months of his life and that he was sane, sensible as witness, he thought, or any other man; that he saw no evidence of aberration of mind or insanity; that he went to see him the night before he died, having been sent for; that he found two or three persons in the room with the testator, among whom was Debolt; the testator asked him to sing for him, saying he had found pleasure in the singing at church; that he did sing for him and they talked about a number of things; that testator was then a very sick man and they talked about his sickness; that he volunteered the information that he had made the bequest to the church; that, at that time, the testator was perfectly clear, mentally, and witness saw no evidence of insanity; that when they talked in the fall of 1895, testator told witness he had no relatives to whom he intended to give any of his estate and he expected to give all that he had to some

good purpose and to the church; that he further said some of his relatives had made an effort to get some of his property and he spoke particularly of a sister who had come to Charleston once, and to whom he had given a ticket to get home, saying that was all she got, and seemed pleased over having thrust them off; that the testator was unable, on account to his deformity, to articulate plainly and it was difficult to understand him and that he had given that as a reason why he had left his people, they having commented on his infirmity to his annoyance; that the testator gave to the church liberally, seventy-two to seventy-five dollars a year besides making special contributions; witness saw testator again on Tuesday morning but that he was sleeping a good deal at that time and does not think he aroused him or had any conversation with him.

E. W. Knight, the son of E. B. Knight who wrote the will, and a lawyer, testifying for the defendants, said he had known the testator for probably twenty years; that on Friday preceding his death, upon returing to his office, he was informed that a telephone message had been received in his absence, saiyng that Mr. Ward wanted Mr. Knight to come down and see him; that he went down and told the testator he had been telephoned for; that testator said he did not want to see him but did want to see his father and wanted him to draw his will; that he further said witness' father knew all about it or that he (Ward) had told him all about it; that witness, saying he would send his father down, went to his father's house that day to take dinner and told him that Mr. Ward wanted him to draw the will and that his father went down to see him that afternoon; that when he went in testator's room no person was there except himself and the testator; that testator was then in apparently perfect possession of his faculties; that he was apparently sick, quite pale, possibly suffering some pain, but had his clothes on and was sitting up in a chair about the middle of the room; that he thought, when informed of the message, that his father was wanted, but he went down to find out what Mr. Ward wanted so he could tell his father; that, at that time, witness' father had retired from practice; that he thought his father was Mr. Ward's lawyer.

Jacob Debolt, one of the subscribing witnesses, but hostile to the will, testified as follows: He had known testator from

1877 or 78; worked for him a great deal; furnished his meals from 1893 to January 1, 1896; ceased furnishing them then because he had no boys to carry them to him; witness' wife did his washing, mending, sewing, and buying of his clothes; testator told witness that he and his wife was to have his property, subject to the payment of his debts and the erection of a six hundred dollar monument; Ward told him never to give a cent of his money to a hospital; at Hot Sulphur Springs, Arkansas, he had been mistreated in the hospital; he had often heard Ward talk to himself and hollow, "B. Ward. Here is B. Ward," and other similar expressions; witness was with him from 1884 to 1890 and during that time he had noticed this peculiarity; afterwards, he got worse in that respect; in conversation, being reminded that he had said certain things, he would deny what he had said in the same conversation; on Thursday, April 2nd, having heard that Ward was sick, witness went to his room about 11 o'clock a. m. and found Ward lying on his bed; Ward had Mattie Jenkins write a receipt for some rent and sent him to collect it; testator ordinarily wore No. 6 shoes but his feet were so swollen then that he had to have a large pair of slippers and witness went and found a pair of No. 11 slippers and purchased them for him; witness staid with him nearly all the time except Sunday night until he died; on that Thursday Ward paid Dr. Rogers ten dollars room rent, taking his receipt; Ward took his bed that day and was delirious at times; witness was there all day Friday and did not see E. W. Knight there, but did see E. B. Knight there at half past one or two o'clock; Knight and Ward had a conversation which witness could not hear, but he did hear Ward say "No" and Mr. Knight say "Will I come back tomorrow?" to which Ward said "No" and that he did not want him to come on Monday; while Mr. Knight was there Ward was raging, tearing his clothes and required witness and Mattie Jenkins to keep him in bed; on Friday night testator had no use of his left arm and left leg; on Saturday his condition was about the same as on Friday; Dr. Barber was there on Monday night; on Sunday morning, before the will was made and before Mr. Knight came, Ward was very restless and made witness and Miss Jenkins get him up in the chair and implored witness to knock him in the head with something; having exhausted himself they put him back

to bed; immediately afterwards Dr. Thomas and Mr. Knight came in; on Saturday Dr. Thomas had directed witness to go on Sunday morning and tell Mr. Knight to come down at ten o'clock and write the will; witness did so; after they came in and spoke to Ward, Mr. Knight sat down and wrote something while Dr. Thomas seated himself in another part of the room; while the writing was going on Ward called witness to the bed two or three times; when Mr. Knight had finished he asked Ward if he had made up his mind as to how he wanted his will made to which Ward replied "No, I haven't," as loud as he could speak; then Mr. Knight suggested that he provide for the payment of his debts, the erection of a monument and leave ten thousand dollars to the church and the ballance of his estate to the hospital, to which Ward replied, "Well—Yes—No;" Ward was then weak and tearing himself; Dr. Thomas took the will to the bed and asked him to sign it, Ward replying that he could not write, Dr. Thomas took hold of his hands; after that, Thomas helped him out of bed into a chair and placed the will before him on the table and he was then unable to sign it but made some scratches or marks on the paper and then Dr. Thomas took hold of his hand but he does not thing any signature or mark was made; witness felt hurt at the way they treated Ward and went out on the street and was sent for; when he returned Miss Jenkins was signing her name; he then signed at the direction of Dr. Thomas; on the next morning Ward was a little better and witness mentioned the will to him and he said he made no will and being informed that he had said he was not satisfied with it; as witness went away that morning he met Dr. Thomas on the street and they had an altercation about the condition of Ward's mind when the will was made which was concluded by witness saying, "Doctor, you have got the will but you haven't got the property. Mr. Ward has got some relatives and they will be hunted up;" testator was in fair condition until 11 or 12 o'clock Monday when he then became delirious and continued so until one o'clock that night when some medicine left by Dr. Barber to quiet him was given him, after which he became quiet and remained so until he died; in 1893, when Ward went to Red Sulphur Springs, he told witness he was going to leave his property to him and his wife; afterwards he spoke of the death of a sister

and said there was probably some other relatives; while away at the springs he left witness in charge of his business; closed out his business in 1895 after returning; in the early part of the week before testator died witness met him and he was complaining; later, witness saw him at his room and he was flighty; when witness went to his room on Thursday he was undressed and in bed; Miss Jenkins was sent for to nurse him; at one time witness's wife presented a bill for thirteen or fourteen dollars for services, which testator refused to pay, saying it was to bear double interest until his death and then she would get it all at once; admitted that he was mistaken in saying that Miss Jenkins had to be sent for on Thursday; admitted that rent was paid Dr. Rogers on Friday evening; testator was in no condition to make a will on Friday nor Saturday nor Sunday; testator had given witness his gold watch in 1893 but had not delivered it to him; on Friday evening he kept motioning toward the desk; Miss Jenkins took out several articles and held them up but he indicated that they were not what he wanted; witness suggested that it might be his watch; she took it out of the desk and testator nodded his head; then she said, "I guess you are the one to have it," and handed it to witness, and he took it and still has it; admitted that Dr. Barber was there on Monday night and sang a hymn; on Tuesday afternoon testator could not see but would say, "I can't see and know your voice and that is all;" on Monday night testator called witness to the bed and said, "Jake, they robbed me, did you get it?", to which witness replied "No," and he said "They robbed me of all I have got."

Mattie Jenkins, another principal witness for plaintiffs, testified as follows: She had been employed by Ward for about four years, in cleaning his rooms and washing for him; since October she had cooked for him and carried his meals to him; he was cleanly and decent in his habits; he had talked of his mother and sister; he took to his bed not more than three days before his death and was up and down then; does not remember when Dr. Thomas first came; on Friday testator sent her after him and told her to stop and tell Mr. Knight to come down; they came and talked a while with testator and Dr. Thomas asked him if he had made his will, and told him it was time he was fixing up his business, and testator said he had not; they

suggested what he should do and he said he did not feel like talking and told them to come back Saturday; instead they came Sunday and talked with him but he did not know anything at the time, being in great misery; one of them wrote the will and told her to sign it and she did so; she read none of it, they did not tell her what it was and it was folded; the signature, B. Ward, was not on it when she signed nor were the words, "His Marks," nor the mark itself; there were some large B's on it; they took testator out of bed, put him in a chair by the table, put a pen in his hand which he could not hold, and Dr. Thomas took hold of his hand and tried to help him, and the B's were there when she was called; she did not hear testator ask Dr. Thomas to sign his name; he did not ask him; Dr. Thomas asked the testator if he did not think he could give the hospital ten thousand dollars, and the reply was that he did not feel like talking and that they should come back tomorrow; something was suggested about the church, too; testator had had a bad night Saturday night and could not walk alone Sunday; Monday morning Mr. Knight came in and testator told him the will was not right and he did not want it and Mr. Knight said he was crazy and did not know what he was talking about; after Mr. Knight went away Dr. Thomas came in and asked for a pen and ink, and after obtaining it went to the bed with a paper and asked testator to write his name and he replied that he could not; Dr. Thomas then went back to the desk and wrote his name and went to the bed and said, "Mr. Ward, see this," to which he replied, "I can't see," and Thomas said, "Oh, yes you can, it is B. Ward," and testator repeated after him "B. Ward;" the paper looked like a will; on Sunday morning testator wanted Debolt to shoot him and imagined he was in a hospital and wanted to be taken out; called for his mother, saying he was hungry; on cross-examination she admitted having testified on the probating of the will in the county court; she did not remember what questions were asked; did not remember whether she testified there that Ward was of sound mind when he made the will; denying that he signed the will, she supposes she told the court so if the question was asked; does not remember whether she said Ward executed the will in her presence and she attested it in his presence and that he was then in sound mind; she did not under-

stand the proceeding but knew it related to the will; she had no recollection of what occurred in the county court; whatever she did say there was true; on Friday testator would lie down and get up and sit in the chair and lean back; she and another person helped him up Monday morning; she was there nearly all day Thursday; Mr. Shawver came over and paid rent Thursday and Mr. Ward was sitting up at his desk and wrote the receipt; witness never wrote any receipt for rent as stated by Debolt; witness went to the office of Mr. Knight in the Kanawha Valley Bank building on Friday for him; she found him there and delivered the message; that was near four o'clock in the afternoon; when Dr. Thomas and Mr. Knight came on Friday evening testator was dressed and sitting in his chair near the stove and there had the conversation with them; she has no recollection of seeing Debolt there on Thursday nor on Friday until after Dr. Thomas and Mr. Knight went away; he was there Saturday morning and in the afternoon of Saturday; testator was delirious Friday night, made her get him up out of bed; Debolt came in and pacified him; witness saw nobody go to the desk Friday night; testator had the keys; she did not open the desk then nor afterwards during testator's life; she put the watch in it Friday evening and gave him the keys and she never afterwards opened it; she never got the watch out for him and never handled it again; she did not know before testator's death that Debolt had the watch and did not think he did have it; Friday night Debolt asked her about the watch and he told her that testator had given it to him, but she never opened the desk for him nor gave him the watch; she thinks he had the watch on Saturday; he told her testator had given it to him and he had it but she did not see it; she did not remember what she had told Mr. Brown about the watch; she did not think testator knew what he was doing when they had him at the table Sunday morning; he had been wanting some one to kill him at six or seven o'clock that morning; he was sitting up; he was saying something but she could not understand very well and he got worse while he was talking; on Monday morning when Dr. Thomas had him repeat "B. Ward" he remarked "His mind is as clear as a crystal;" testator had promised to provide for her in his will; said he would give her a piece of land lying on the outskirts of the city but

she had no idae of getting it; she had employed an attorney to make out her claim against the estate; she had presented a claim for five hundred dollars, which had been compromised at something over two hundred dollars; testator had paid her for her cooking, house cleaning and other services except the nursing and her claim was for that.

Mrs. C. S. Debolt testified as follows: Testator began boarding at her home in June, 1893, and continued for about a year, after which she sent his meals to him, but he came to the house occasionally; she had noticed a great change in his mind in the last year of his life; he slept there several nights; would cry out in his sleep "Come quick, they have robbed me; they have got all I have got;" he talked to himself a great deal and would call out "B. Ward;" she mended his clothes and once in 1887 he complained of a vest not fitting and she had him take off his coat and found he had it on upside down; just before he went to Red Sulphur Springs he agreed with her and her husband that if anything should happen his property would be left to him and her; soon after that he told her his house on Quarrier Street would be her's after his death; she had often seen him when on the street stop suddenly and shake his cane at some imaginary object and talk to it as if he were crazy, but she could not understand what he was saying; she spoke to him of the death of his sister in 1895 and of a nephew whom he called John just a short time before he died; he had told her and her husband he would never give a cent to a hospital and that there were too many churches and he did not believe in giving all he was worth to the churches; that was in 1893.

B. D. Davies, witness for the plaintiffs, testified as follows: From August, 1895, until April, 1896 he had a photograph gallery in the rooms on the floor above those occupied by the testator; during all that time he had often heard testator hollowing and swearing at himself saying, "Ward, God damn your old soul," and using other similar language; he often came to a wash stand in the hall of the building with only an undershirt, pants and shoes on and wash to the annoyance of witness and his customers; witness thought testator was not of sound mind; he thinks testator drank, had heard that he did but never saw him drinking, but had seen him go into saloons; witness had heard him swear about the hospital several times along

about the time they were talking of building a hospital, declaring it to be an outrage on the tax payers.

Maggie M. Pollard, witness for plaintiffs, testified as follows: She worked for testator at intervals from 1885 or 86 until about two years before his death, cleaning his rooms and writing for him; she staid with him one whole winter while he roomed over Rogers' Drug Store and while he was sick and she thinks it was in 1891; he would talk to himself about money, saying he must raise so much money for the next day and then he would turn around and say, "No, I have got money; I have got more money than any person; I have got plenty of money;" this would occur as he started out of the room, and sometimes he would see witness sitting in the room and would say, "Maggie, I gues you wonder who I am talking to," and upon her assenting he would say, "I am talking to a gentleman, I was talking to B. Ward;" called himself in loud tones and would hollow; the year he went out of business he told witness he was going out of business on account of his mind failing him; he was decent in his habits but she had seen him go to the window early in the morning before putting on his clothes and was a little careless in that way; he was in the habit of gathering up old dirty clothes and wanted her to clean up a shirt that was completely mildewed and she told him it caused disease and microbes and he directed her to burn it, and the next day he told her he could feel microbes crawling in his blood, and every time he would get sick after that he would attribute it to microbes; being dissatisfied about a fifty dollar contribution he had made to a hospital, he told her he would give nothing more to charity; he paid her very little and told her he would some time give her more money, enough to fix herself, at least; her face being disfigured by the bite of a dog, he told her he would give her money enough to have her face fixed when she was ready for it; he had said he had money in all the banks in Charleston; she had voluntarily gone to the attorneys and told them what she knew, upon the pretext of being interested in the trial out of mere curiosity and wanted to know when it would take place; testator had told her his mind was entirely wrong; one morning he said "Shut the door quick. See that pretty girl there. I want to keep her here. Ain't she pretty? Keep her in here," but witness saw nobody;

that was two or three years before testator died; he was not entirely sane.

James H. Roges, witness for plaintiffs, testified as follows: He owned the building in which testator roomed and the drug store under his rooms; he had known testator for many years; he was always peculiar but more so for a few months before his death; he brought back from the mountains a lot of rough canes and tried to sell them to his friends for half a dollar a piece; he often heard him hammer, hollow and curse himself up in his room; witness went to his room a short time before his death and found some worn out brooms and was told by the testator he had them there as weapons and indicated how he would jab them in the eyes of any one attacking him and then beat him to death; he often came to witness for whiskey, and, being in a nervous condition, witness put some drug in it to quiet him, cautioning him against taking anything elsewhere; he had cursed the hospital; witness did not consider him sane months before he died; years before that he regarded him as a very sensible man, but he was very odd and peculiar; witness remembers when testator's sister came to see him, but he would only say she was one of his relatives and wanted money but it would be time enough to get it after he was gone.

George W. Gates became acquainted with testator in 1863 or '64; he then had the habit of talking to himself, but always talked rationally in common conversation; in 1863, being sick and alone, he gave witness a belt to keep for him which he said contained eighteen hundred dollars, and about a week afterwards witness returned it to him, and some time after that he came for it, and witness and his brother went with him to his room where they found it in his trunk and after that incident they were not so intimate any more; testator expressed great surprise and opoligized; during that spell of sickness he wanted somebody to stay with him and was afraid he would jump out of the window.

Lillian Flagg says: She had worked for the Debolts and had heard testator say he was going to give his Quarrier Street property to Mrs. Debolt; she had heard him muttering to himself and seen him shaking his cane violently, the last time in February before he died; his mind was not so good

in the last three or four months of his life as it had been; he had mentioned his nephew John; he had expressed his hostility to hospitals; other than the muttering and the shaking of the stick he seemed to be a man of good common sense.

Mrs. Lena Fadelay had known testator for about eight years; had worked for him at intervals for about five years, washing and mending; had often heard him talking to himself and say somebody wanted to rob him or had taken his money; once he had asked her to hunt his shoes and she found he had them on; had often heard him say he would never give a cent to the church or a hospital and that they did not treat him right in the hospital and there was no use of so many churches; he had said he closed out business because his mind was not good and he could not remember as he ought to.

Daniel Davies worked in the photograph gallery over testator's room; had heard him cursing himself; had seen him come out to wash only partially dressed; knew he had kept the stump broom as a weapon as stated by Rogers; he seemed to be in fear all the time; witness thinks he was insane.

Lillie Wehrle had known testator eight years; worked and ran errands for him about six years; had heard him talking to himself and hollow "Hello there, B. Ward;" once when Dr. Butts' sister came for a bucket of coal testator had given her a bucket of water which she took away and when his attention was called to it he said he was crazy; she thought he was insane; she was a daughter of Mr. Fadeley; testator had slapped her once because her little brother had thrown some nails down in the hall.

Alvin Goshorn had known him ever since the war; had seen him twice within ten days or two weeks of his death; testator knew him the first time but did not know him the second time he went; he was oblivious to everything around him; had heard him calling his name and cursing himself from the street; at the time he visited him last he was unfit to do any business; thinks he drank a good deal of whiskey; he was very boisterous about his establishment when he was drinking; up nutil the time he quit business he was a sane man but very cranky; thinks he became insane by excitement; he was afraid of him but had never heard of his hurting anybody; he had never regarded him as being entirely right.

John D. White had taken him into his hotel when he first came to Charleston; he was very peculiar and talked and walked in his sleep, and had cramps in his arm which caused him to cry out with pain; having put him in a room to sleep with another man he was compelled to change him; he was a successful business man and accumulated considerable property.

George A. Baker had known him since 1859 and had done some work for him not long before he died; part of the work had been done by witness's son whom testator paid; but he sent for witness two or three times to pay him, forgetting that he had paid him and that he had been so informed; that was not long before his death, probably a year or more.

Joseph A. Jones said he had known testator for a great many years; had occupied the same rooms that the Davies Bros. used and for the same purpose, prior to their taking them, and during part of the time testator occupied the rooms below them; that he heard peculiar noises from the room occupied by Ward and had been informed by him that he had rheumatism; some times he could be understood and other times he could not; on one or two occasions he had heard him swear; not having known of such conduct on the part of Ward when he was well, witness had thought he was not exactly at himself but was not able to say whether he was insane.

J. W. Malcolm had known testator since about 1884; in 1887 or 1888, while passing by his store in company with another man his attention was attracted and, on going in, he found Ward with a hatchet in his hand making a vicious attack upon one Clark, whom he had backed up against a lot of merchandise and who was defending himself with a poker; Ward was wild with anger and did not act like a sane man on that occasion.

After this evidence was introduced by the plaintiffs, the defendants called John S. McDonald who, at the time the will was probated, was president of the county court, and he testified that the usual questions were propounded to Mattie Jenkins and she had answered them in the affirmative and seemed to understand perfectly the nature of the proceeding and the questions propounded to her. On the subject of the soundness of mind of the testator she qualified her testimony only to the extent of saying he had been a little flighty at times but she believed that he was of sound mind at the time he executed the will. It was also

shown that she had testified on that occasion that the will was signed at the time it purported to have been signed, but not as to the manner in which it was done.

E. A. Woodall, who was also a member of the court and present on that occasion, and J. F. Brown, the executor of the will, both testified to the same effect. It was further shown that Dr. Thomas and Mr. E. B. Knight also testified in the probate proceeding to the same effect. Mr. Brown further testified that the attorney of Mattie Jenkins had presented to him, as executor, a claim for three thousand dollars which was afterwards compromised and settled at two hundred and thirty-five dollars and fifty cents, she having claimed 156 days of service which he settled at one dollar and fifty cents per day. He had no knowledge of her coming to the office for Mr. Knight and never saw her to know her until after Mr. Ward's death. He had received the telephone message, requesting Mr. Knight to come to Ward's room on Thursday evening, to the best of his recollection, and the voice was that of a woman. He delivered the message that evening or the next morning to E. W. Knight. E. B. Knight was not then a member of the firm, he having retired, but was sometimes in his his son's room at the offices. Witness had been a member of the city council and on the board of hospital trustees and on the committee concerning the hospital and knew that Dr. Thomas had no special interest in the hospital at the time the will was made. Witness had found among the papers of his testator receipts from saloons amounting, in the aggregate, to one hundred dollars and forty cents bearing dates running from December 31, 1894, to March 2, 1896. In addition to that the executor paid another saloon bill of five dollars and forty cents, the items of which were dated March 6th, 10th, 14th and 17th. The executor found twenty-four dollars and some cents in one of the banks and nothing in any of the others.

Maggie Pollard had come to him and claimed a considerable demand against the estate, saying she was a witness on behalf of the plaintiffs and that the testator had promised to provide the expense of an operation on account of the deformity of her face. Witness had known testator very well since his boyhood and regarded him as a perfectly sane man and of good mind, not educated, but of shrewd business and common sense.

W. F. Shawver, who occupied the testator's business house at

the time of his death, went to the testator's room on the 2d or 3rd day of April, 1896, between 10 and 11 o'clock A. M., to hand him a check for the rent, and found him as he always found him, in his sitting room; when witness rapped he came and opened the door and witness thinks he sat in a chair by the table; he had his clothes on and took the check and handed witness a receipt; witness, seeing he was sick, did not stay long; testator was sane and had the same business sagacity he always had; wanted to increase the rent in acocrdance with the notice he had given him; afterwards on the same day he saw Ward on the street going toward the bank on which the check was drawn, but looked rather frail. C. W. Young, cashier of the bank, testified that the check which had been given by Shawver had been paid April 2, Thursday, to Mr. Ward at the bank.

Mrs. Florence Minsker knew the testator well; he had often visited at her house; she saw him at his room the last time on Monday April 6, 1896; having heard that he was sick, she and another lady went to see him after 5 o'clock in the evening; he knew her and called her by name as he always did; called her Florence and asked her to come back that night; his mental condition was as it had always been; she saw no evidence of insanity in him; he was not raving nor tearing at himself but was lying down and every few minutes wanted to get up. After supper she and her husband went back to see him again and he knew both of them; she knew the date because she kept a diary and had noted it; on this last visit he seemed to suffer more, complain more and was breathing hard. George Minsker, her husband, had known the testator about twenty years and thought he was sane; when he visited him that evening he called his name and he was not raving nor tearing his clothes; witness saw nothing wrong with his mental condition; he had always been regarded as an odd and eccentric man.

A number of the most prominent and substantial business and professional men in the city testified to their long acquaintance with the testator, and while admitting his peculiarities, they all regarded him as a man of shrewdness and a man of good sense and stability of character. An effort having been made, when too late, to obtain the deposition of Mr. E. B. Knight, and much testimony having been introduced tending to impeach the alleged

execution of the will which had been made under his provision and direction, the defendants were allowed to prove his high standing as a citizen and professional man.

This very extensive summary of the evidence, as given by the witnesses, is necessary to a perfect understanding of the question raised on the instructions given and refused, upon which the assignments of error are based.

It is objected that the court erred in directing the issue before the establishment by proof that the plaintiffs are heirs of the testator. In the absence of any objection on the part of the defendants, the court will not make any inquiry as to the *bona fides* of the claim of the plaintiffs. If objection that they had no such interest as entitled them to demand a test of the validity of the will had been made below, the court, upon a rule to show cause why the bill should not have been dismissed for that reason, would have made such inquiry. *Dower* v. *Church,* 21 W. Va. 23, 48. Here, the objection was not made in the court below and it cannot be made in this Court for the first time. The answers only disclaim any knowledge of the heirship of the plaintiffs and aver that they all reside in distant states. They do not call for proof of the *bona fides* of the claim of heirship, and clearly do not constitute such an objection as ought to have moved the court below to make the inquiry. When the want of interest affirmatively appears in the bill some courts hold that the objection may be made for the first time in the appellate court. 16 Ency. Pl. & Pr., 1,015. It does not so appear here.

At the instance of the defendants, this instruction was given: "The court instructs the jury that a person who signs his name as a witness to a will, by his act of attestation solemnly testifies to the sanity of the testator, and if he afterwards attempts to impeach the validity of the will, his testimony invalidating the will ought to be viewed with suspicion." At the instance of the plaintiffs, the court gave the following instruction: "The court instructs the jury that, unless discredited by the facts and circumstances appearing by the evidence in this case, the evidence of witnesses present at the execution of the paper writing purporting to be the last will and testament of said Brigham Ward is entitled to peculiar weight." It is urged that these two instructions are inconsistent and, therefore, tend

to mislead the jury. In one of them the jury are told that the testimony of witnesses who must be included in the class to which the other relates must be viewed with suspicion, while in said other instruction they are told that their evidence is entitled to peculiar weight. This is clearly irreconcilable and amounts to inconsistency unless the clause in the one given for plaintiffs, saying the evidence of these witnesses is entitled to peculiar weight "unless discredited by the facts and circumstances appearing by the evidence in the case," so limits it as to cut out the inconsistency. The attestation of the will by Jacob Debolt and Mattie Jenkins undoubtedly went to their discredit as witnesses for the plaintiff for their testimony in this case was in direct contradiction of their act of attestation, which is held to be testimony to the sanity of the testator as well to the fact of his having executed the will. *Lamberts* v. *Cooper's Ex'r.*, 29 Grat. 68. None of the witnesses were present except the attesting witnesses. By their act of attestation they deprived their testimony of the weight to which it would otherwise be entitled when testifying against the will. Plaintiffs' instruction relates to none of their testimony except that concerning the execution of the will. As the defendants were entitled to their instruction, the giving of plaintiffs' instruction amounts to a modification of it, which has a tendency to mystify its meaning and nullify its effect. The clause, "unless discredited by the facts and circumstances appearing by the evidence of this case," does not eliminate the inconsistency, nor make the instructions reconcilable. These instructions are not general but relate to the evidence concerning the facts of the actual signing and attesting of the will. Two of these witnesses having repudiated, and testified against, their solemn acts of attestation, the defendants were entitled to have the court tell the jury in plain and unmistakable terms that they should view the evidence of these two witnesses with suspicion. *Webb* v. *Dye,* 18 W. Va. 376. "The attesting witnesses of a will who are introduced to prove the will was not properly executed, or the incapacity of testator, will not be excluded; but their evidence will be received with much suspicion." *Lambert* v. *Cooper's Ex'r.,* 29 Grat. 61. Judge Staples, in the opinion of the court, said, "A person who signs his name as a witness to a will, by his act of attestation solemnly testifies to the sanity of the testator. If he should afterwards

attempt to impeach the will upon the ground of the want of sufficient capacity, his evidence will not be positively rejected, but it is received with the utmost caution." This is asserted as a proposition of law. It was the duty of the court to give it to the jury in this case when requested. It could not, at the same time, tell the jury directly or indirectly that the testimony of such witnesses was entitled to peculiar weight without introducing the grossest inconsistency and withholding from the defendants the benefit of an instruction to which they were entitled. It is true, the instruction given for plaintiffs has been approved in *Jarrett* v. *Jarrett,* 11 W. Va. 584; and *Kerr* v. *Lunsford,* 31 W. Va. 659, but in those cases the witnesses present did not contradict their former solemn testimony. In *Jarrett* v. *Jarrett,* the matter in controversy was the validity of a deed as to which no attestation was required. In the other case the attesting witnesses testified in favor of the will. Hence, the authorities cited in favor of the instruction do not support it. The propriety of an instruction always depends upon the facts and circumstances of the case.

Unless the rule of law, casting suspicion upon the testimony of subscribing witnesses who, after subscribing, testify against the sanity of the testator is to be thrown aside as never having been the law, contestants of a will, relying upon the testimony of subscribing witnesses to impeach the will for insanity of the testator or non-execution of the will, are not entitled to an instruction saying, in so many words, or, in effect, that the testimony of such witnesses is entitled to peculiar weight, because such an instruction is in direct and irreconcilable conflict with the law. The contestant has no right to submit to the jury the question, whether such testimony shall be viewed with suspicion, under the uncertain and general phrase, "unless discredited by the facts and circumstances appearing by the evidence." The law says they shall so view it, and the contestees have the right to have the court tell them so in plain terms. When such instruction is properly drawn and requested, the court must give it, without modification, either by an interpolation in that instruction, or by giving another, at the request of the contestants, having the effect of such modification. The rule of law relied upon by contestees is announced not only in Virginia, but in this state also. *Webb* v. *Dye,* 18 W. Va. 376.

Subscribing witnesses may testify against the will, and their testimony may be believed and acted upon by the jury as true, and it may be that, under peculiar circumstances and all the facts in the case, they could not render a good verdict in favor of the will, as in the case of *Tucker* v. *Sandridge,* 75 Va. 546; but this does not argue that, in a case, where there are numerous witnesses on both sides, and a wide field of investigation is covered, and the evidence is directly and strongly conflicting, the contestants may have the jury instructed that the evidence of subscribing witnesses, testifying against the will, in the face of much evidence offered to show improper motives on their part, shall be entitled to peculiar weight, unless discredited by facts and circumstances. It is discredited to the extent that it must be viewed with suspicion, and that is not to be submitted to the jury as a question. Its submission tends to mislead and confuse.

Plaintiffs' instruction No. 14 was given and reads as follows: "The court instructs the jury that unless discredited by the facts and circumstances appearing by the evidence in this case, the evidence of physicians testifying in this case is of great weight." In support of this *Jarrett* v. *Jarrett,* cited, *Kerr* v. *Lunsford,* cited, and *Nicholas* v. *Kershner,* 20 W. Va. 251, are cited, but this is not the instruction that was given in those cases. The similar instruction which has been approved by this Court reads as follows: "The evidence of physicians, especially those who attended the testator, and were with him considerably during the time it is charged he was of unsound mind, is entitled to great weight." In this case two of the physicians were with the testator at the time of his alleged unsoundness of mind and testified from personal knowledge of his condition, while the other three testified as experts and without any personal knowledge whatever of the matter in controversy. It is important to note here that in the cases in which this instruction has been heretofore approved, the physicians who testified all had some personal knowledge of the condition of the person whose sanity was in question. They were not only personally acquainted with him but had prescribed for him or talked with him with the view of ascertaining his mental condition. That this is an important distinction which the court should have noted in its instruction appears from the case of *Harrison* v.

*Rowan,* 3 Wash. 580, where it is held that when several physicians, as experts, give their testimony on a question of mental capacity, the court may properly tell the jury that the opinion of the physician who attended the ·testator in his last illness is entitled to more regard than that of the others. In Thompson on Trials, section 2,429, the true rule concerning expert testimony is said to be that "the testimony of experts is to be consideerd like any other testimony—is to be tried with the same tests, and is to receive just as much weight and credit as the jury deem it entitled to when viewed in connection with all the circumstances." In support of it numerous authorities are cited. In 8 Ency. Pl. & Pr., 775, it is said that, "While the court may not infringe 'this right of the jury to determine the weight of the evidence, it is, however, proper for it to announce to them rules sanctioned by reason and experience to enable them to rightly weigh the evidence submitted to them." An illustration of this principle is that it is proper to tell the jury that, in estimating the value of the testimony of an expert, it is proper to consider his means of knowledge and his opportunities to know whereof he speaks. *State* v. *Hinkle,* 6 Ia. 380; *Bennison* v. *Walbank,* 38 Minn. 313; *Roberts* v. *Johnson,* 58 N. Y. 613; *Insurance Co.* v. *Smith,* 124 U. S. 405; *Insurance Co.* v. *Ward,* 140 U. S. 76. These principles make it manifest that this Court, in laying stress upon the value of the testimony of physicians in the cases cited, means nothing more than to say that the evidence of witnesses who testify from their personal knowledge, being at the same time possessed of professional knowledge, learning, skill and experience which enables them to better understand the matters to which they testify than persons not possessed of such superior advantages, is entitled to more weight than the testimony of persons not so possessed. In those cases the physicians did not testify as experts, nor did the instructions characterize them as experts. As three of the physicians who testified in this case, a majority of them, testified only as experts, it was error to instruct the jury that the evidence of the physicians who testified in the case was entitled to great weight. Drs. Thomas and Barber did not testify merely as experts. The former testified from both personal and scientific knowledge, and the latter from personal knowledge only, except on cross-examination. As their testimony was not entitled to any greater weight than that of

other witnesses, the court might as well have selected any other class and said their testimony was entitled to great weight. Unless there is some substantial ground in respect to means of knowledge and power to know, upon which to base a distinction between the value of the testimony of some witnesses and that of others, the court cannot make ·such distinction by giving an instruction, without invading the province of the jury.

As has been indicated, the instruction given for plaintiffs ·varies from the one which has been approved by this Court, as proper to be given under the circumstances of the cases of *Jarretl* v. *Jarrett, Kerr* v. *Lunsford,* and *Nicholas* v. *Kershner,* in failing to indicate the superiority of the evidence of physicians testifying from personal, as well as scientific, knowledge. Their instruction construes the language used in those cases, and applicable to their peculiar facts, to mean what it clearly never did mean. In no case decided by this Court, or the court of last resort of Virginia, has it ever been held that purely expert testimony is entitled to great weight, or that the evidence of physicians testifying as experts only, is entitled to such weight. We are truly told there were giants on the Virginia bench when the rule laid down in these West Virginia cases was first announced, but they never, in a single instance, applied it to purely expert evidence. It was first announced in *Burton* v. *Scott,* 3 Rand. 399, decided as early as 1825. In that case, Drs. Cabell and Stevens were the physicians who testified, the former having been the family physician, and the latter a personal acquaintance of the testator, and it does not appear from the report that a single hypothetical question was put to either of them. In *Parramore* v. *Taylor,* 11 Grat. 220, the physicians testifying had both been family physicians of the testator. In *Simmerman* v. *Songer,* 29 Grat. 9, the testifying physicians had been regular attending physicians of the testatrix for many years. In *Cheatham* v. *Hatcher,* 30 Grat. 56, the physician who testified, had evidently been attending the testatrix professionally at the time the will was executed. In *Montague* v. *Allen,* 78 Va. 582, Drs. Harris and McGuire had attended the testatrix in her last illness, the former regularly and the latter on a special occasion, and Dr. Cunningham had known her and testified from personal knowledge. In *Shacklett* v. *Roller,* 97 Va. 639, Dr. Hopkins, who testified, had been the family physician

of the testator. The principle of law deducible from any case is to be determined by what has been decided. Hence, to learn the meaning of language used in a head note, it must be read in connection with the opinion. So reading the Virginia and West Virginia cases, it is ascertained that it has never been decided that purely expert testimony is entitled to great weight, as matter of law. Rogers on Expert Testimony, after having cited some of these cases, says, at section 204: "We have seen in the preceding section that courts have asserted that the opinions of physicians on questions of mental capacity are entitled to greater weight than those of ordinary witnesses. An examination of those cases, however, shows that the opinions of medical men are considered entitled to greater weight than the opinions of non-professional persons, provided the physicians have had personal observation and knowledge, of the person whose capacity is the matter in issue." A critical examination of the language used in *Jarrett* v. *Jarrett* shows that it is open to construction. It says "the evidence of physicians * * * is entitled to great weight." They sometimes testify as experts and sometimes from personal knowledge. The language used does not say which kind of testimony from physicians is entitled to such weight. The latter is the only kind found in any of the cases. Does not that make it clear that no other kind is meant? Can it be said that the court decided a matter not submitted to it?

Much reliance is placed upon the following from 8 Ency. Pl. & Pr. 777: "By other authorities it is held that a court may instruct the jury to accord great and especial consideration to the opinion of those who are manifestly and pre-eminently skillful in the matter concerning which they testify." This text is likewise misconceived. It does not mean what is claimed for it. With one or two exceptions, the cases cited in support of it, show that the witnesses, having scientific knowledge, who testified in them, had personal knowledge of the material subject to which their evidence related. It would be an unjustifiable waste of time to take them up one after another and demonstrate the truth of this assertion. The books are accessible to any person who may care to verify it.

In this connection, it is further objected, by counsel for appellees, that the appellants cannot complain of this instruction

because, at their instance, the court gave another similar one. It reads as follows: "The court instructs the jury that the evidence of physicians, especially those who attended the testator, and were with him during the time it is charged he was of unsound mind, is entitled to great weight." This instruction embodies the vicious principle propounded by the other one, it is true, but the record shows that the court had given the other when this was asked for, and ruled that it should go in, and that afterwards this was requested by the contestees. From this it is apparent that this one was taken merely to off-set the mischief done by putting it in the qualified form approved in the cases of *Jarrett* v. *Jarrett* and others referred to. Whether, by so doing, the contestees have waived their objection, it is unnecessary to decide, as a new trial must be awarded on other grounds, and the question is not likely to be again presented.

The next objection is to the action of the court in giving plaintiffs' instruction No. 15, which reads as follows: "The court instructs the jury that unless discredited by the facts and circumstances appearing by the evidence in this case, next to physicians, and those who were present either as attesting witnesses of said alleged will of said Brigham Ward, or otherwise, at the time the same is alleged to have been executed, are those whose intimacy with the said Brigham Ward in attending to his rooms and daily wants is such, the jury from the evidence believe has given them an opportunity of seeing said Brigham Ward at all times, observing his actions, and conduct, and watching the operations of his mind." The general principle sought to be applied by this instruction is asserted in *Jarrett* v. *Jarrett,* cited. But the instruction is objectionable in limiting the class whose intimacy gave them opportunity to observe the testator's actions, conduct and operations of his mind to those who attended his rooms and daily wants. The doctrine is asserted in *Jarrett* v. *Jarrett* is not so restricted, nor is it in *Burton* v. *Scott,* 3 Rand. 399, when t was first announced by Judge Carr. Many of the witnesses testifying maintain intimate relations with the testator and did not attend to his rooms and daily wants. Upon what principle of law can the court say to the jury that the evidence of one class of person whose intimacy gives opportunitty for knowledge is to be preferred to another class of witnesses whose intimacy gives perhaps equal opportunity? The testator had a

wide acquaintance in the city, especially among business people.
With some of them he was intimate and often called upon them
at their various places of business and met them on the streets
and conversed with them after closing out his business in 1893.
J. E. Dana knew him well up until the time of his death and
says he met him every three or four days and always stopped
and talked with him. F. W. Abney, a merchant, knew him from
1876 until the time of his death; thought he was a fairly good
business man; had heard that he had the habit of talking to
himself; had been informed by his wife that people had noticed
this eccentricity at Red Sulphur Springs, but he had regarded
him as sane. Andrew Ruffner had known him and sold him
goods for fifteen or twenty years; regarded him as a good busi-
ness man; he had often come into their store after he had quit
business and on these occasions gave every evidence of being a
rational man; had heard he had the habit of talking to himself.
A. M. Scott kept up an acquaintance with him for many years
up to almost the time of his death; he had met him on the
streets and talked with him a short time before he died; he re-
garded him as a sane man. C. C. Blain had known him for a
great many years; he frequently came to Blain's store and con-
versed with him; was there a week or ten days before his death
for possibly half an hour; witness had no reason to believe his
mental condition was different from what it had been; he con-
sidered him perfectly sane; witness had been to testator's room
three or four times; the last occasion being probably a year be-
fore his death; witness had heard him talking to himself. Mrs.
C. C. Blain had known him well. In July, 1895, he had been
at her house and she had talked with him; soon after that she
went to his room to arrange for her brother to go with him
to the springs. A. Burlew, a lawyer, had maintained an intimate
acquaintance with him for many years; associated with him
in politics and had boarded at the same hotel with him for a
while, and regarded him as a very clear headed man during all
the time he knew him, above the general average of men; he
had seen him and talked with him in 1895 on his return from
the springs, and testator had invited him to his room, saying
he had some canes he had cut in the mountains and would give
him one if he would come down. C. A. Gates had known him
for many years and transacted business with him, and he re-

garded him as a sane man. W. F. Goshorn, a hardware mer-
chant, had carried on his business only about two hundred feet
from where testator had done business and knew him well and
considered him sane. After testator had closed out his busi-
ness, witness carried on his business in the building adjoining
that in which Ward had his rooms and had heard him talking
up in his rooms, but did not know whether others were present
or what he said. S. C. Burdette, a lawyer, had known him very
well and had heard him talking to himself in his store, but he
considered him sane. He never suspected insanity. John Slack
had known him since 1863 or 64 and had talked with him for
a considerable time about the 15th or 20th of March and he
regarded him as being perfectly sane and a man of good judg-
ment. He had on one occasion, while on the street, heard Ward
talking to himself in his room, but thought he was talking in his
sleep. Mr. and Mrs. Minsker, the substance of whose testimony
has been given, were undoubtedly intimate with him and had
good opportunities to know his mental condition. J. W. M.
Appleton had Ward with him at his hotel at Salt Sulphur
Springs in 1894 for a week, and had seen nothing in his conduct
which suggested insanity, and he had formerly known him very
well. There was so much testimony of so many intelligent peo-
ple who had had fairly good opportunities of forming a just
estimate of the mental condition of the testator at the time
when it is said that, by reason of his eccentricities, delusions,
illusions and hallucinations, he must have been insane, it was
clearly wrong to subordinate it to the testimony of certain other
persons who had at various times had opportunities to know the
condition of his mind.

Another objection to this instruction is that it gives undue
prominence and weight to the opinions of the witnesses. It has
been very properly held by this Court in *Jarrett* v. *Jarrett* and
*Kerr* v. *Lunsford* that the opinions of witnesses who are not
experts is entitled to little or no weight unless supported by
good reason and facts. The principal inquiry in all cases of
this kind is whether the person who made the will had sufficient
mind and memory to understand the nature of what he was
doing and to recollect the property which he meant to dispose
of, the object of his bounty and the manner in which he wished
to distribute it. *Nicholas* v. *Kershner,* 20 W. Va. 251; *Kerr* v.

*Lunsford,* 31 W. Va. 261. This inquiry goes to the time of the execution of the will, and evidence of the facts and circumstances of prior date tending to show imbecility of mind is only important as bearing upon the question of the mental condition of the person at the time of the execution of the will. There may be facts showing loss of memory, forgetfulness and other facts tending to show impairment of mind and memory, but if the acts and conduct of the testator at the time of the making of the will or execution of the deed show that he had the power of memory and reason and intelligence sufficient to understand what he was doing, these facts are accorded more weight than those of the other class. Thus in *Beverley* v. *Walden,* 20 Grat. 147, 159, "By the deed written by himself with great particularity and techical precision, and by letters relating to the sale and the execution of the deed, expressing his regret that his wife had refused to unite in the deed, and on other subjects, all furnishing intrinsic proof of a sound mind. Evidence of this kind has always been held by the courts to be entitled to far more weight and importance than the opinions of witnesses based upon the erratic conduct and eccentricities of the party of whom they speak." *Temple* v. *Temple* 1 Hen. & Mun. 476; *Mercer* v. *Kelso,* 4 Grat. 106; 3 Rob. Prac. (Old) 335; I Lomax Ex'rs., 9, 10. The point of time at which the testator's compewas not directly contradicted, this instruction could only have the evidence of these facts tending to show mental derangment tency is to be tested is that of the execution of the will; his antecedent or subsequent condition is chiefly important as it may bear upon that epoch. *Sloan.* v. *Maxwell,* 2 Green Ch. (N. Y.) 563, 572. In this case the court said of the testimony of one witness, he "relates very few important facts bearing upon the question of capacity; all, however, that he does state are of competency, none of incompetency. Every thing that was said or done by the testator at the execution of the will, was rational, apwas subject to hallucinations, delusions and illusions. But, as and to know the manner in which he wished to distribute it, and that such capacity might exist notwithstanding the testator propriate, and in proper time and place." [*] To the same effect see McDaniel's Will, 2 J. J. Marsh. (Ky.) 331. On the subject of the standard of capacity for the making of a will the court testator should have understood the nature of the business in

which he was engaged and had sufficient mind to recollect the property he meant to dispose of and the objects of his bounty, properly instructed the jury that it was only necessary that the gone to the weight of the opinions of the witnesses, and that in the face of their own testimony and the testimony of other witnesses that up until within two days of the time of the execution of the will. the testator attended to all his business affairs in a competent manner. Debolt testifies that on Thursday when testator took to his bed he still had sufficient mental power, memory included, to collect his rents and pay his debts. Shawver on that day paid him his rent, took his receipt and talked with him about the increased rent for the future. On the same day testator went to the bank and had Shawver's check cashed. On Friday evening he sent for Rogers to come up to his room and there paid him his rent. It thus appears from the evidence of the plaintiffs themselves that until after the testator had been attacked by his last sickness he still retained sufficient mental power to attend to ordinary business matters. Whether he did so until the time of the execution of the will is the vital question in the case. All antecedent facts tending to show mental derangment and deterioration of mind were to be considered as bearing upon that question, and, according to all authorities, the opinions of the witnesses testifying to those facts are entitled to much less weight than the facts themselves. Hence, the instruction was vicious, not only in making an unwarranted classification of this opinion testimony but also in giving it too much prominence and weight, whereby the legal standard of testamentary capacity was obscured.

It is further claimed that the court erred in giving plaintiffs' instruction No. 5, which reads as follows: "The court instructs the jury that if they believe from the evidence that F. S. Thomas, signed the name of Brigham Ward, deceased, to the paper writing offered in evidence as his last will and testament dated April 5, 1896, and that at the time the attesting witnesses were engaged in signing the same, the said Brigham Ward did not possess sufficient consciousness to recognize and understand what said attesting witnesses were doing and to assent to their acts, or that he did not possess sufficient consciousness and sufficient physical strength to have dissented from the said attestation, and to have arrested and prevented the same

by indicating his dissent, or disapproval, if he had desired to do so, then the jury must find that the said paper is not the will of said Brigham Ward." The grounds of this objection are, first, that it is founded upon a distinction between the testator's condition at the time he signed the will and his condition at the time it was attested, without evidence tending to establish such distinction; and second, that there is no evidence to show that if the testator was sane at the time the will was executed and attested he did not have sufficient physical strength to dissent from the attestation. A careful reading of the instruction leads to the conclusion that it relates only to the time of the attestaion, but is it relate to both the execution and attestation they occurred practically at the same time. The instruction was approved as a proper one in *McMechen* v. *McMechen*, 17 W. Va. 683, and the court did not err in giving it.

The next objection is to the giving of plaintiffs' instruction No. 6, which reads as follows: "The court instructs the jury that the attestation of the paper writing dated April 5, 1896, purporting to be the last will and testament of Brigham Ward, deceased, given in evidence in this case, is absolutely necessary to its execution; and if the jury believes from the evidence that before this important part of the execution of said paper writing, and while it was duly done, said Brigham Ward, by reason of unconsciousness, or mental, or physical inability was unable to dissent from the attestation, and to arrest and prevent the same, by indicating his dissent, or disapproval, if he had desired to do so, the said paper writing is not valid as a will." The objection to this is that there is no evidence to show that the testator had not physical strength to dissent. There is some evidence of that kind, but it must be conceded that the testimony of the witnesses for the plaintiffs, who were present at the execution of the will, is chiefly in reference to testator's mental condition at that time. However, as there was evidence tending to show that he was very weak it was proper for the jury to make that inquiry. This instruction was also taken from *McMechen* v. *McMechen*, and although it is largely a repetition of instruction No. 5, and the court was not bound to give it for that reason, it was in its discretion to do so.

A further assignment is that the court erred in giving plaintiffs' instruction No. 8, which reads as follows: "The court in-

structs the jury that if they believe from the evidence that there is a doubt of the competency of said Brigham Ward, deceased, to make a will, on the 5th day of April, 1896, and that he had, at that time, relations living of whom he knew, (whether nephews or nieces) and that by the paper writing of April 5, 1896, purporting to be his last will and testament, he devised and bequeathed all his property, real and personal, to others than his relations, then the fact that he made such devise and bequest, is proper to be considered by the jury." The contention is that the relationship here is so remote and the testator knew so little of his relatives that the principle of law embodied in the instruction, ought not to be applied. There seems to be no exception to the rule. No authority for it is cited, and the principle is asserted in *McMechen* v. *McMechen* without qualification or exception. This assignment is not well taken.

Another assignment is that the court erred in refusing to give the following instruction, asked for by the defendants: "The court instructs the jury that if they believe from the evidence that the witness, Mattie Jenkins, signed her name as a witness to the paper writing in controversy as the will of Brigham Ward, then by her act of attestation she solemnly testified to the sanity of the said Brigham Ward. And the court further instructs the jury that if they also find from the evidence that the said Mattie Jenkins subsequently to her attestation of said paper testified on oath before the county court of Kanawha county that at the time of such attestation the said Ward was of sound mind, that then the jury will be justified in rejecting her testimony on this trial that the said Ward at the time of such attestation was not mentally capable of executing a will."

The only objection to this instruction seems to be that the witness was designated by name and that it is the same in substance as defendants' instruction No. 12, which has been quoted. It is not fully covered by instruction No. 12, for it includes in addition to the act of attestation the testimony of the witness before the county court when the will was probated. In *Kerr* v. *Lunsford,* the court held that an instruction that the evidence of Dr. J. W. Bates, Jr., the physician who attended the testator and was his family physician, was entitled to great weight, was properly refused. But that was not upon the ground that the name of the witness was used, but because it was equivalent to telling the

jury that the evidence of a certain witness was entitled to great weight . In *Ammerman* v. *Teeter,* 49 Ill. 402, it is held that the court, under the circumstances of that case, did not err in naming a witness in an instruction which was applicable to his testimony. In *Insurance Co.* v. *La Pointe,* 118 Ill. 384, it was held to be improper to give an instruction requiring the jury to consider in connection with the evidence of a certain witness his interest in the subject matter of the suit. But that was upon the ground that the instruction would have given undue prominence to that fact, as some of the witnesses on the other side of the case were also interested. So it amounts to nothing more than that the instruction was too narrow. No case has been found in which it has been held that the mere naming of a witness in an instruction vitiates it. One fault in this instruction is that it is too narrow. It tells the jury they are justified in rejecting the testimony of the witness but it does not tell them they may give it such weight as, in their judgment, it is entitled to. While it is apparent that the witness testified falsely either in the county court or in the circuit court, if the testimony for the plaintiff is true, it was for the jury to say in which instance she had testified falsely, and, if from her own evidence and other evidence in the case, they were satisfied that her testimony in this case was true and her attestation of the will and her testimony in the county court were false, it was in their power to give credit to her testimony in this case, and the instruction should have been broad enough to cover both phases of the question.

An equally fatal objection is that, in giving it, the court would have invaded the province of the jury, in another way. The instruction assumes that the witness has testified falsely. She doubtlessly did on one occasion or another, and in jurisdictions less jealous of the rights of the jury, the court might say so to the jury. A very strict rule on this subject is laid down in *State* v. *Thompson,* 21 W. Va. 741, where the Court holds that "It is error for a court in the trial of a case, to intimate any opinion in reference to matters of fact, which might in any degree influence the verdict, nor can the court instruct the jury as to the weight to be given by them to the evidence of any witness, whether the witness be impeached or not, or whether he is contradicted as to the material facts or not."

In lieu of this instruction, the court, on its own motion, gave the following: "The court instructs the jury, that they are the judges of the evidence and the weight to be given thereto and of the credibility of witnesses testifying in this case; that if they believe that any witness has testified falsely in this case as to any matters in issue, that then the jury have the right to disregard such false testimony or give to it and all the evidence of such witness such weight as the jury may in their opinion believe it was entitled to." The action of the court in giving this instruction is also complained of, it being insisted that the jury should not have been told that they might give to the false testimony such weight as they might think it entitled to. Instructions of this class have been carefully considered in *State* v. *Thompson,* in which the following was approved as a correct enunciation of the law: "If the jury believe from the evidence that any witness who has testified in this case has knowingly and willfully testified falsely to any material fact in the case, they may disregard the whole testimony of such witness, or they may give such weight to the evidence of such witness on other points as they may think it entitled to. The jury are the exclusive judges of the weight of the testimony." In Thompson on Trials, section 2,425, this instruction is approved as a good model. It is difficult to see, however, how the jury could believe testimony which they had found to be false could be entitled to any weight, and the court told them they could give only such weight as they might believe it entitled to. They were not directed to give it any weight. The instruction left it wholly dependent upon whether they believed it entitled to. They were not directed to give it any weight. The instruction left it wholly dependent upon whether they believeed it entitled to any weight. But the instruction is bad in this, that it does not inform the jury that they may reject the whole of the testimony of the witness who wilfully testifies falsely as to material matters.

The next objection is to the action of the court in refusing to give defendant's instruction No. 14, reading as follows: "The court instructs the jury that if they believe from the evidence that Dr. F. S. Thomas was the physician who attended the testator during his last illness and who had been his physician for at least three years previously thereto and that he was

present at the execution of the will, and attested the same as a subscribing witness thereto and that said Thomas is a credible person and a man worthy of belief then his evidence is entitled to great weight." It ought to have been given. It submitted to the jury the question of the credibility of the witness and told them if they found him to be a credible person and a man worthy of belief, his evidence was entitled to great weight, and this was proper because of his superior opporaunities to know the condition of the testator's mind at the time of the execution of the will. He had been testator's physician and was present at the time of the execution of the will. He was the only attesting witness who testified in favor of the will in this case. He not only had superior opportunities to know the truth but his conduct as a witness was consistent and, as has been shown, it was no objection that he was named in the instruction. How far he was discredited, if at all, by his supposed interest in the bequest to the hospital, was left to the jury. This instruction is widely different from the one disapproved in *Kerr* v. *Lunsford,* which did not submit to the jury the question of the credibility of the witness. It simply told them that the evidence of a certain witness was entitled to great weight. This instruction does nothing of the kind. But it was properly refused for others had been given covering substantially the same ground. The court was not bound to give more than one instruction of a kind.

The action of the court in refusing to give defendant's instruction No. 15 is also assigned as error. That instruction is as follows: "The court instructs the jury that if they believe from the evidence that E. B. Knight prepared the will in question in this cause at the request of B. Ward, that said Knight was a lawyer of conspicuous ability and very high standing in his profession and a man of pure and upright character, and that said Knight was present when said will was executed and superintended and directed the testator and witnesses in the executi6on of it and that said Knight was well acquainted with Ward for many years before said will was executed, then it is proper for the jury to consider whether in view of these facts it is probable that said Brigham Ward was insane at the time said will was executed or that said will was procured to be executed by him by means of imposition, fraud or undue influ-

ence." This was properly refused, because instruction No. 1, which the court gave, is to the same effect and in almost the same language.

The next complaint is that the court erred in permitting Dr. Ewing to state that the inability of a man, by reason of his physical condition to sign his name, and his making marks in various places around the place at which his name should have been written, was evidence of mental defect. The witness was testifying as an expert. It was a hypothetical question. No specific objection was wade to it and none appears.

The next objection is that the court erred in refusing to allow witness J. F. Brown to state the reason why the hospital was leased to Dr. Thomas on the terms contained in the written lease. As there was evidence introduced tending to show interest on the part of Dr. Thomas in the hospital, which could have had no purpose other than to affect his credit and throw suspicion upon his conduct in connecton with the execution of the will, it was proper to permit the introduction of evidence to show the extent of that interest and the circumstances under which it was acquired. It is urged here by the contestants that, as the contract was between Dr. Thomas and the City of Charleston, a municipal corporation, no inquiry could be made beyond what was shown by the record. This position is not tenable. It is not a proposition to show that the contract was different from what it was shown by the record to be, but simply to show under what circumstances the lease was made as shedding light upon the interest of the witness. Mr. Brown had been a member of the city council and was thoroughly familiar with the facts which could not be had from the city, as a corporation, which is termed in law an artificial person, incapable of testifying. The evidence could only come from documents or living witnesses and it has been shown that Mr. Brown was conversant with the facts. Hence, he should have been permitted to answer the question.

The contestants cross-assign eror in the action of the court in admitting testimony relating to the character of E. B. Knight and in instructing the jury that it was proper for their consideration. It was shown before this evidence was introduced that an effort had been made, when too late, to take the testimony of Mr. Knight, and much of the evidence introduced

by the contestants reflected upon his conduct and capacity at the time of the execution of the will, it was most just and reasonable to permit the jury to know and consider the character and ability of the man. It is well settled that evidence of character of third persons as well as parties is admissible to a limited extent and in an exceptional way, even when parties are alive. That being true, the reason is much stronger when death has closed the lips of the person whose good faith and integrity is called in question. It is admitted that Mr. Knight was present at the time of the execution of the will and superintended and directed what was done. His connection with the *res gestae* being established and the *bona fides* of the transaction being questioned, and he being dead so that the jury could not hear what he might have said had he been alive, nor have seen him and formed an estimate, from his appearance, demeanor and testimony, of his character and capacity, it was proper to supply that omission to the extent of showing what his character and capacity were. In *Rowt's Adm'r* v. *Kile's Adm'r,* Ginmer (Va.) 202, it is held: "On the plea of *non est factum,* it being proved that a son of the plaintiff said he could counterfeit the hand of the defendant, evidence may be given to show the infamy of the son's character, circumstances existing, to render the exception of the instrument doubtful." This is on the opposite side of the proposition but it illustrates the principle. If it is proper to show bad character on the part of one who is connected with the transaction, why should not evidence of good character be admissible? Coalter, Judge, in this case said: "But the other evidence not set out in the bill of exceptions, may have tended to prove an agency in Richard Rowt in the execution of the paper in question, and thereby have legalized the evidence touching his capacity to imitate the handwriting of the intestate John Rowt; and if so, I can see no good reason against an inquiry into the general character. Surely the plaintiff might have proved the fairness of his character on the one side, and I can therefore see no reason why its foulness might not be relied on as a circumstance on the other." While the general rule is that a party to a civil action, or some person concerned in the transaction out of which the transaction arose, is charged with fraud or moral delinquency will not generally result in allowing evidence of character to

be admitted, the rule is not without exceptions.    5 Am.
& Eng. Ency. Law, 2 Ed. 863, 864. . In *Ruan* v. *Perry,* 3 Cain,
(N. Y.) 120, it was held that in an action of tort in which
the defendant was charged with gross depravity and fraud upon
circumstances merely, evidence of his good character was ad-
missible.  This was followed in *Dawkins* v. *Gault,* 5 Rich. L.
*St.* 151; *Wertz* v. *Spearman,* 22 S. C.. 200; *Townsend* v. *Graves,*
3 Paige (N. Y.) 453; *Henry* v. *Brown,* 2 Heisk. (Tenn.) 213.
But it was disapproved in *Gough* v. *St. John,* 16 Wend. (N. Y.),
646; *Flower* v. *Insurance Co.,* 6 Cowen (N. Y.), 673; *Hough-
lating* v. *Kelderhouse,* 2 Barb. (N. Y.) 149; *Pratt* v. *Andrews,*
4 N. Y. 493; *Ward* v. *Herndon,* 5 Post (Ala.) 382; *Church* v.
*Drummond,* 7 Ind. 17; *Gebhart* v. *Burkett,* 57 Ind. 378; *Simp-
son* v. *Westonburger,* 28 Kan. 756, and other cases.  But the
doctrine has been revived in New York in *Bowerman* v. *Bower-
man,* 76 Hun. 46.   *Pope* v. *Schoolfield,* 145 N. Y. 598.   As
bearing upon the admissibility of this evidence, the following
note is found in Buller's Nisi Prius, 296: "But where the sur-
viving subscribing witness was called to impeach a will for fraud
in obtaining it, Lord Kenyon permitted the devisee to call per-
sons to the general good character of the two subscribing wit-
nesses, who were dead." While Mr. Knight was not a subscribing
witness he had far more to do with the execution of that paper
than the subscribing witnesses and was in at least as good a posi-
tion to know the state of the testator's mind as the subscribing
witnesses.   He had conversed with him and received directions
for drafting the will and talked with him afterwards.   His
intelligence was such as to enable him to know the condition
of the testator's mind.   While not a subscribing witness, he
would be competent to testify as fully as they.   But whether
this evidence is admissible for the purpose of showing testa-
mentary capacity or not it is competent in rebuttal of the charge
of undue influence.   Reason suggests that it is competent for
both purposes and should have such weight as the jury may
think it entitled to.

Express authority for this is found in some of the English
cases.  In *Stephenson* v. *Walker,* 4 Esp. 50, Lord Kenyon said: ·
"In the great case of Jolliffe's will, Lords Dudley and Ward
and other persons were examined as to the character of the

person by whom the will was prepared, and the legality of admitting such evidence was not doubted." In *Bishop of Durham* v. *Beaumont,* 1 Camp. 207, 210, Lord Ellenborough said: "I fully accede to the doctrine laid down in Doe, on the demise of *Stephenson* v. *Walker.* There the attesting witnesses whose character was disputed were dead, and it was properly held that the party claiming under the will should have the same advantage as if they had been alive. In that case they must have been personally adduced as witnesses, when their character would have appeared on their cross-examination, and being dead, justice requires that an opportunity should be given to show what credit was to be attached to their attestation of the will. In like manner, the Court of King's Bench held in the time of Lord Mansfield, that evidence of the conduct of deceased witnesses might be received, to attract credit to their testimony, or to destroy its effect." To the same effect is *Provis* v. *Read,* 5 Bing. 435.

Errors having been found in the record, it remains now to determine whether they are such as constitute cause for reversal and the granting of a new trial. On this question, the latest and most exhaustive work on the subject of appeal and error, the Cyclopedia of Law and Procedure, Vol. 3, 386, says: "The next question which arises is, how is the reviewing court to determine whether error shown by the record is harmless or prejudicial? The decisions are, at least apparently, very conflicting, but it is possible that the statements therein, when applied to the particular facts of the cases, may be harmonized. There are two rules promulgated by the decisions, and they seem to be radically opposed to each other. Thus, one line of decisions holds that, if there is error apparent on the face of the record, a presumption of prejudice arises which cannot be disregarded, unless the record affirmatively discloses that the error was not prejudicial." That is undoubtedly sound law under the decisions of this Court when the error is in the giving of improper instructions. *Clay* v. *Robinson,* 7 W. Va. 368; *Beatty* v. *Railroad Co.,* 6 W. Va. 388; *State* v. *Douglass,* 20 W. Va. 298; *Hall* v. *Lyons,* 29 W. Va. 420. In this last case JUDGE GREEN says: "It has been repeatedly decided by this Court, that, when an erroneous instruction has been given by the court to the jury, the presumption is that the exceptor

was prejudiced thereby, and the judgment will be reversed for this reason, unless it clearly appears from the record of the case, that the exceptor could not have been prejudiced by the giving of such erroneous instruction; in which case the judgment will not be reversed for such cause." *State* v. *Kerns,* 47 W. Va. 266; *State* v. *Dickey,* 46 W. Va. 319; *Osborne* v. *Francis,* 38 W. Va. 312. Another rule established by this Court is, that whenever a correct instruction is refused, the judgment will be reversed, unless the appellate court can see from the record that, even under the instruction, a different verdict could not have been rightfully found. *Boggess* v. *Taylor,* 47 W. Va. 254; *Nicholas* v. *Kershner,* 20 W. Va. 251; *Bank* v. *Waddill,* 27 Grat. 451. From the lengthy quotation and review of the evidence in this case, it will be seen that it is very contradictory and that a correct verdict turns upon two questions which must be resolved in the light of what occurred and what the conditions were at one and the same time and place, subject to such light as is thrown upon them by antecedent and subsequent occurrences, and that as to all these matters the evidence for the plaintiffs and defendants involves grave questions of credibility of witnesses which belongs to the province of the jury, and that the objectionable instructions which were given, and the correct instructions which were refused bear directly upon these delicate questions and the weight and value of certain testimony. Few cases are to be found in which the giving of improper instructions and the refusal of proper instructions would be more likely to prejudice the parties interested.

As there must be a new trial it is unnecessary to pass upon the action of the court in refusing to set aside the verdict as being contrary to the law and the evidence. Any discussion of the evidence in that connection would be improper under the circumstances.

For the errors noted, the decree entered in this cause on the 29th day of April, 1899, by the circuit court of Kanawha County, must be reversed, the verdict of the jury set aside and a new trial of the issue awarded.

*Reversed, Remanded.*